POLSINELLI LLP
JOHN W. PETERSON (SBN: 179343)
john.peterson@polsinelli.com
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone:  (615) 259-1510
Facsimile:   (615) 259-1573

Attorneys for Defendants First Data Merchant Services
LLC and Wells Fargo Bank, N.A.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREEN PAYMENT SOLUTIONS, LLC,<br><br>                              Plaintiff,<br><br>          v.<br><br>FIRST DATA MERCHANT SERVICES CORPORATION; WELLS FARGO BANK, N.A.; and DOES 1 to 100,<br><br>                              Defendants. | Case No. 2:18-cv-1463 DSF (ASx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      August 26, 2019<br>Time:      1:30 p.m.<br>Ctrm:      7D<br>Judge:     Hon. Dale S. Fischer |
| FIRST DATA MERCHANT SERVICES LLC and WELLS FARGO BANK, N.A.,<br><br>                    Counter-Plaintiffs,<br><br>          v.<br><br>GREEN PAYMENT SOLUTIONS, LLC,<br><br>                    Counter-Defendant. | |

# **TABLE OF CONTENTS**

I.   Introduction ...................................................................................... 1

II.   Statement of Uncontroverted Material Facts .................................. 2

    A.   Background ............................................................................... 2

    B.   The Marketing Agreement ....................................................... 3

        1.   ISO Obligations ............................................................. 4

        2.   The Program Standards and Credit Policy .................... 5

        3.   The Card Brand Rules .................................................... 7

        4.   Defendants' Right to Terminate ..................................... 9

        5.   Choice of Law and Attorneys' Fees .............................. 9

    C.   Plaintiff's Breaches of the Card Brand Rules and the
        Agreement ................................................................................. 9

        1.   The G2 and Visa Detections. ....................................... 10

        2.   FDMS confirmed accounts of merchants Plaintiff
            boarded were used to sell illegal and/or brand-
            damaging products. ...................................................... 11

        3.   FDMS confirmed Plaintiff boarded numerous
            merchants that were engaged in fraudulent conduct. ............... 12

        4.   Plaintiff instructed merchants to provide false or
            misleading information. ............................................... 12

        5.   Plaintiff knowingly submitted merchant applications
            containing false or misleading information to
            Defendants. .................................................................. 14

        6.   Prior to termination, multiple employees notified
            Richard Cha of Plaintiff's submitting false
            information to Defendants. ........................................... 14

        7.   FDMS notified Plaintiff of the G2 detections months

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

before termination.................................................................14

D.    Defendants terminated the Agreement. ................................15

III.   Legal Standard.................................................................16

IV.   Argument........................................................................16

A.    Breach of Contract ............................................................16

1.    Defendants properly terminated the Agreement......................17

a.    Plaintiff repeatedly violated the Card Brand Rules. ..........................................................17

b.    Plaintiff engaged in fraudulent conduct. ....................19

2.    Defendants properly withheld Plaintiff's Residuals. ...............20

3.    Plaintiff cannot prove an essential element of its claim..........................................................20

B.    Conversion ......................................................................21

C.    Intentional Interference with Prospective Economic Relations.........................................................21

D.    UCL................................................................................23

E.    Accounting ......................................................................24

F.    Declaratory Relief ............................................................25

V.    Conclusion........................................................................25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Kristal Auto Mall Corp.*,
  53 N.Y.S.3d 180 (N.Y. App. Div. 2017)..................................................21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..................................................................................16

*Ciambrone v Metropolitan Life Ins. Co.*,
  No. 657016/2017, 2019 WL 854597 (N.Y. Sup. Ct. Feb. 22, 2019) ................25

*Ctr. for Rehab. and Nursing at Birchwood, LLC v. S & L Birchwood, LLC*,
  939 N.Y.S.2d 78 (N.Y. App. Div. 2012)..................................................24

*Cumisky v. James River Corp.*,
  Civ.A. No. CV-93-1975 (DGT), 1995 WL 520021 (E.D.N.Y. Aug. 17, 1995)..................................................................................................22

*East End Labs., Inc. v. Sawaya*,
  914 N.Y.S.2d 250 (N.Y. App. Div. 2010)..................................................21

*Elghanian v. Elghanian*,
  717 N.Y.S.2d 54 (N.Y. App. Div. 2000)..................................................24

*Farmers Ins. Exch. v. Zerin*,
  61 Cal. Rptr. 2d 707 (Cal. Ct. App. 1997) .............................................21

*Giardini v. Settanni*,
  70 N.Y.S.3d 57 (N.Y. App. Div. 2018).....................................................21

*Herrejon v. Ocwen Loan Servicing, LLC*,
  980 F. Supp. 2d 1186 (E.D. Cal. 2013) ..................................................25

*Jolley v. Chase Home Fin., LLC*,
  153 Cal.Rptr.3d 546 (Cal. Ct. App. 2013) .............................................24

*KAM Constr. Corp. v. Bergey*,
  56 N.Y.S.3d 740 (N.Y. App. Div. 2017)..................................................23

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

*Korea Supply Co. v. Lockheed Martin Corp.*,
    131 Cal.Rptr.2d 29 (Cal. 2003) ........................................................... 22, 23, 24

*Lee v. Hanley*,
    191 Cal. Rptr.3d 536 (Cal. 2015) ..................................................................... 21

*McMahan & Co. v. Bass*,
    673 N.Y.S.2d 19 (N.Y. App. Div. 1998) .......................................................... 25

*Morgenroth v. Toll Bros.*,
    876 N.Y.S.2d 378 (N.Y. App. Div. 2009) ........................................................ 24

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ......................................................................... 16

*Pantoja v. Countrywide Home Loans, Inc.*,
    640 F. Supp. 2d 1177 (N.D. Cal. 2009) ........................................................... 24

*Penn Warranty Corp. v. DiGiovanni*,
    810 N.Y.S.2d 807 (N.Y. Sup. Ct. 2005) ........................................................... 23

*Satmodo, LLC v. Whenever Communications, LLC*,
    No. 17-cv-0192-AJB NLS, 2017 WL 1365839 (S.D. Cal. Apr. 14,
    2017) ................................................................................................................. 23

*U.S. Nonwovens Corp. v. Pack Line Corp.*,
    4 N.Y.S.3d 868 (N.Y. Sup. Ct. 2015) ............................................................... 20

*United States v. Mallory*,
    372 F.Supp.3d 377, 381 (S.D. W.V. 2019) ...................................................... 18

*Unitel Telecard Distrib. Corp. v. Nunez*,
    936 N.Y.S.2d 17 (N.Y. App. Div. 2011) .......................................................... 24

**Statutes**

21 U.S.C. § 802(16) ................................................................................................. 18

21 U.S.C. § 812 ........................................................................................................ 18

Ala. Code § 20-2-23(4)(b)(322) .............................................................................. 18

Ark. Admin. Code 007.07.2 ..................................................................................... 18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

Ark. Code Ann. § 5-64-201 ........................................................................ 18

IC 35-31.5-2-321(1)(HHH) ....................................................................... 18

W.S.A. § 961.14 (7)(L)(mk) ..................................................................... 18

**Other Authorities**

Fed. R. Civ. P. 56(a) ................................................................................. 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

## I.   INTRODUCTION

This breach-of-contract case arises out of a Marketing Agreement ("Agreement") between Plaintiff Green Payment Solutions, LLC ("Green Payment" or "Plaintiff") and Defendants First Data Merchant Services LLC ("First Data" or "FDMS") and Wells Fargo Bank, N.A. ("Wells Fargo") (together, "Defendants") whereby Plaintiff solicited merchants to sign up for Defendants' payment-card-processing services. In November 2017, after learning Plaintiff had been consistently and systematically breaching the terms of the Agreement, Defendants terminated the Agreement for cause. Plaintiff's breaches and improper conduct are not in dispute. The Agreement expressly allowed Defendants to terminate the Agreement and Plaintiff's compensation for certain reasons, including: (1) Plaintiff's repeated violation of the rules of the card brands, such as Visa and Mastercard ("Card Brand Rules"), or (2) Plaintiff's fraudulent conduct. It is undisputed that both occurred here. Accordingly, summary judgment is entirely appropriate.

First, it is undisputed that Plaintiff signed up numerous merchants for processing services through Defendants who either (1) sold illegal and/or brand-damaging products, such as kratom[1] and CBD[2] and/or (2) were engaged in fraudulent activity by selling products other than those they were authorized to sell through websites they failed to disclose on their merchant applications or by "factoring" transactions for other businesses. Signing up merchants who sell illegal and/or brand-damaging products or who engage in fraudulent activity clearly violates the Card Brand Rules. In fact, FDMS received multiple Card Brand Rules violation notices from the Card Brands because of the conduct of the merchants

---

[1] Kratom is a plant indigenous to Southeast Asia that has psychoactive properties similar to certain illegal drugs. (SOF ¶ 56.)

[2] CBD is an oil derived from the plant *Cannabis sativa L.* (*Id.* ¶ 58.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

Plaintiff boarded. Thus, it is indisputable Plaintiff repeatedly violated the Card Brand Rules.

Second, and independently, it is undisputed that Plaintiff routinely submitted false and misleading information to Defendants designed to intentionally conceal the fact merchants it was boarding were selling brand damaging and illegal products. In fact, the evidence is undisputed that Plaintiff taught and instructed several merchants specifically how to falsify information and documents to defraud Defendants. Plaintiff's fraudulent conduct constitutes a separate and distinct violation of the Card Brand Rules.

Any one of these categories of breaches was alone sufficient for Defendants to terminate the Agreement and Plaintiff's continuing compensation. Regardless, there is ample undisputed evidence of all of this conduct.

Plaintiff also alleges five other causes of action for various tort and equitable claims; however, the sole crux of Plaintiff's Complaint is that Defendants breached the Agreement by terminating its continued compensation. Accordingly, if the Court finds, as it must, that Defendants did not breach the Agreement by terminating Plaintiff for cause, these claims must also be dismissed.

For all of these reasons, the Court should dismiss Plaintiff's Complaint in its entirety with prejudice and award Defendants attorneys' fees.

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### A.   Background

To accept debit or credit cards, merchants must contract with "Acquirers" or "Card Processors." (Defendants' Statement of Uncontroverted Facts ("SOF") at ¶ 1.) Acquirers or Card Processors agree to "sponsor" merchants into "Card Brand Networks" established by "Card Brands" like Visa and Mastercard. (*Id.* ¶ 2.)

Acquirers and Card Processors often contract with independent sales organizations ("ISOs") to sell their processing services to merchants. (*Id.* ¶ 3.)

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

Depending on the ISO's agreement with the Acquirer or Card Processor, when an ISO solicits a merchant, the ISO may submit a completed merchant application to the Acquirer or Card Processor. (*Id.* ¶ 4.) If approved, the merchant then contracts directly with the Acquirer or Card Processor. (*Id.* ¶ 5.) Acquirers and Card Processors rely on ISOs to provide true and accurate information on the merchant applications submitted for the review and underwriting process. (*Id.* ¶ 6.) The process of an ISO submitting a merchant application and the merchant contracting with an Acquirer or Card Processor is known as "boarding." (*Id.* ¶ 7.)

Here, Wells Fargo, an Acquirer, and FDMS, a Card Processor, contracted with Plaintiff, an ISO, for Plaintiff to solicit merchants for their Program[3] and board those merchants to process with them. (*Id.* ¶ 8.)

## B.    The Marketing Agreement

Plaintiff and Defendants entered into the Agreement on March 24, 2011. (*Id.* ¶ 9.) Plaintiff agreed to serve as an ISO for Defendants and to market Defendants' Program to prospective merchants in accordance with the express terms of the Agreement. (*Id.* ¶ 10.) In exchange, Plaintiff received monthly "Residuals," calculated as a percentage of the processing fees for the merchants it boarded with Defendants, which together formed Plaintiff's merchant "Portfolio." (*Id.* ¶ 11.)

Plaintiff utilized employees and independent contractors in soliciting and boarding merchants with Defendants. (*Id.* ¶ 12.) One of Plaintiff's independent contractors was Jesse Cretaro.[4] Until December 19, 2014, Plaintiff did not have a written contract with Mr. Cretaro. (*Id.* ¶ 14.) On that date, Plaintiff entered into a

---

[3] The Agreement defines "Program" as Defendants' "program of Merchant participation in the Bank Card systems described in the Merchant Agreement." (*Id.* ¶ 8.)

[4] Mr. Cretaro contracted with Plaintiff both individually and through his limited liability company, Mensch, LLC. (SOF ¶ 13.)

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

written contract with Mr. Cretaro. (*Id.* ¶ 15.) Just one month later, on or about January 22, 2015, Plaintiff entered into a new contract with Mr. Cretaro. (*Id.* ¶ 16.) Importantly, Plaintiff's new contract with Mr. Cretaro did not require him to comply with the Card Brand Rules or the Agreement even though this was an express requirement of the Agreement. (*Id.* ¶ 17.)

### 1.   *ISO Obligations*

Plaintiff and its employees and independent contractors owed Defendants certain contractual obligations. One of Plaintiff's most important obligations was to comply with all "Rules," which included "*all* bylaws, rules, operational regulations, procedures, and guidelines" promulgated by the Card Brands, including but not limited to the Card Brand Rules. (*Id.* ¶ 18.) The Agreement was made subject to the Rules and Plaintiff agreed to "be bound by *all* applicable Rules, including the Rules pertaining to" Acquirers, Card Processors, and ISOs. (*Id.* ¶19.) The parties agreed the Agreement would be "automatically amended to reflect any change in any applicable" Card Brand Rule or law. (*Id.*)

In addition to complying with all Rules, Plaintiff was also required to:

- notify Defendants of any information it reasonably considered relevant to a determination of any existing or potential merchant's creditworthiness;
- comply with all Program Standards (defined below);
- fully (and accurately) complete and submit to Defendants a merchant application for each prospective merchant;
- *verify* each prospective merchant conducted or intended to conduct a *bona fide* business operation, including inspecting the merchant's premises;
- use its best efforts to cause each merchant to fully perform its obligations under the merchant agreement between the merchant and Defendants; and
- in utilizing independent contractors representing themselves as working for Plaintiff, *enter into a written agreement with each such contractor requiring*

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

1         *the contractor to comply with the Agreement and all Card Brand Rules, laws*

2         *and regulations.*

3 (*Id.* ¶¶ 20-25.) Plaintiff expressly warranted all information it provided to

4 Defendants was, to its knowledge, "correct, complete and not misleading." (*Id.* ¶

5 26.)

6         Plaintiff further agreed to be liable to Defendants where any merchant

7 application Plaintiff submitted contained "significant inaccuracies or omissions,"

8 provided that Plaintiff "had actual knowledge, or should have had knowledge

9 based upon reasonable due diligence, of the inaccuracies or omissions at the time

10 the Merchant Application was submitted" to Defendants. (*Id.* ¶ 27)

11         Finally, Plaintiff was required to indemnify Defendants for, among other

12 things, any breach of its obligations under the Agreement; any false or misleading

13 warranty or representation Plaintiff made to Defendants; any failure by Plaintiff to

14 fully comply with the Card Brand Rules; any fraud by Plaintiff or its independent

15 contractors; and any act of Plaintiff's independent contractors. (*Id.* ¶ 28.)

16               2.    *The Program Standards and Credit Policy*

17         As part of its obligations, Plaintiff was at all times responsible for ensuring

18 Plaintiff and each of its employees and independent contractors complied not only

19 with the Card Brand Rules but also with Defendants' "Program Standards." (*Id.* ¶

20 30.) The Program Standards incorporated into the Agreement set forth Defendants'

21 credit criteria, standards, and policies and procedures and were provided to

22 Plaintiff for its reference in soliciting prospective merchants. (*Id.* ¶ 31.) The

23 Program Standards were drafted in part to help enforce the Card Brand Rules and

24 to protect Defendants. (*Id.* ¶ 32.) The Agreement's Schedule B is incorporated into

25 the Program Standards and identifies "categories of merchants who are ***always***

26 ***unacceptable*** under the Program and ***should not be solicited by ISO for the***

27 ***Program".*** (*Id.* ¶ 33.) The Program Standards also include "other policies,

28

5
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

procedures, fines and penalties established by [Defendants] and provided to [Plaintiff] in writing that are designed to promote Merchant satisfaction, to preserve relationships with existing Merchants, to facilitate the growth of the Program, and to ensure the financial safety or soundness of Defendants and their Program." (*Id.* ¶ 34) Defendants could modify the Program Standards any time in their sole discretion. (*Id.* ¶ 35.)

The Agreement and Program Standards prohibited Plaintiff from signing up or boarding certain "categories of merchants," including but not limited to:

- those selling any "illegal products/services";
- those "engaged in activity prohibited by Mastercard and Visa"; and
- those engaged in factoring or aggregating. (*Id.* ¶ 36.)

On August 30, 2011, the parties executed an amendment that replaced the Agreement's Schedule B with the FDMS Credit Policy. (*Id.* ¶ 37.) The amendment states the FDMS Credit Policy may be amended at any time upon written notice to Plaintiff. (*Id.* ¶ 38.)

The FDMS Credit Policy also contains a list of "UNQUALIFIED/ UNACCEPTABLE BUSINESS" and states: "Do not solicit as these accounts are outside of Credit Policy Guidelines." (*Id.* ¶ 39.) The unacceptable and unqualified merchants identified in the FDMS Credit Policy include, but are not limited to:

- those engaged in factoring or aggregating;
- those selling any "illegal products/services";
- those selling "[h]erbal smoking blends and herbal incense";
- those "engaged in any activity prohibited by the Card Brands";
- those selling "[n]utraceuticals"; and
- those selling "[s]ubstances designed to mimic illegal drugs (including herbal smoking blends & herbal incense)." (*Id.* ¶ 40.)

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

The 2015 Program Standards updated the Credit Policy,[5] which similarly identifies "UNQUALIFIED/UNACCEPTABLE BUSINESS," including but not limited to those identified above and prohibited under the earlier Credit Policy. (*Id.* ¶ 41.) The 2015 Credit Policy clarifies, however, that kratom is prohibited as a substance "designed to mimic illegal drugs and/or other psychoactive product[.]" (*Id.* ¶ 42.)

In addition to identifying unqualified and unacceptable businesses Plaintiff was not permitted to sign up or board, the Program Standards also contain certain requirements with respect to Plaintiff's business operations and boarding of merchants, many of which Plaintiff failed to comply with. (*Id.* ¶ 43.)

### 3.   *The Card Brand Rules*

The Card Brands impose numerous rules that apply to every participant in the payment-card system, including but not limited to Acquirers, Card Processors, ISOs, and merchants. (*Id.* ¶ 45) Plaintiff agreed to be bound by all Card Brand Rules, regardless of which participant(s) a given Rule was designed to apply to. (*Id.* ¶ 46.) The Card Brand Rules are generally designed to minimize the risk in the payment-card system and facilitate security. (*Id.* ¶ 47.) The Card Brand Rules prohibit, among other things:

- illegal and/or brand-damaging transactions;[6] and
- fraudulent activity.[7]

The Card Brand Rules also prohibit ISOs from repeatedly boarding  merchants that engage in illegal and/or brand-damaging activity or fraud. (*Id.* ¶ 50.)

Visa and Mastercard administer programs to implement and enforce their

---

[5] Defendants provided Plaintiff written notice of amendments to the Program Standards. (*Id.* ¶ 44.)

[6] (*Id.* ¶ 48.)

[7] (*Id.* ¶ 49.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

rules, including the Visa Global Brand Protection Program ("GBPP") and the Mastercard Business Risk Assessment and Mitigation Program ("BRAM"). (*Id.* ¶ 51.) Although the word "kratom" does not appear in the text of the Card Brand Rules, at all relevant times, GBPP and BRAM deemed kratom to be "illegal and/or brand-damaging" and therefore prohibited under the Visa and Mastercard Rules, including but not limited to Visa Rules 1.5.1.4 and 1.10.1.3 and Mastercard Rules 1.13.2, 3.7, and 5.11.7. (*Id.* ¶ 52.) In fact, Visa has issued a GBPP Guide clarifying that Visa deems kratom to be "brand-damaging" and that the sale or facilitation of the sale of kratom violates Visa's rules, including but not limited to Visa Rules 1.5.1.4 and 1.10.1.3. (*Id.* ¶ 53.) Moreover, Visa sent FDMS at least five rule-violation notices because merchants Plaintiff boarded sold kratom. In each instance, Visa deemed the sale of kratom "illegal and/or brand damaging" in violation of the Visa Rules. (*Id.* ¶ 54.) Kratom was also expressly illegal under the laws of several states and cities. *(Id.* ¶ 55.) During all relevant times, the commercial sale of CBD was also illegal under federal law and thus prohibited by the Card Brand Rules. (*Id.* ¶¶ 57-59.)

The Card Brand Rules also prohibit boarding merchants engaged in fraudulent conduct, including but not limited to "factoring" (also known as "laundering" or "aggregating"). (*Id.* ¶ 60.) Factoring is a practice commonly used by merchants who cannot qualify for a merchant account and merchants who want to conceal their true identity from the Acquirer, the Card Brands, and law enforcement. (*Id.* ¶ 61.) Factoring occurs when a merchant uses its merchant account to process transactions for another entity. (*Id.* ¶ 62.) Factoring also occurs when a merchant creates a shell company, which applies for a merchant account but acts only as a front. (*Id.* ¶ 63.) Once the merchant account is approved, the fraudulent merchant then launders its own transactions from its actual business through the shell company's merchant account. (*Id.*) Factoring is illegal and

8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

constitutes fraudulent conduct under the Agreement and the Card Brand Rules; engaging in such conduct qualifies as an automatic violation of the Card Brand Rules. (*Id. ¶* 64.)

The Card Brand Rules also prohibit submitting merchant applications that contain false or misleading information, such as an inaccurate MCC or SIC[8] code or inaccurate product descriptions. (*Id.* ¶ 65.) ISOs who intentionally use incorrect or inaccurate MCCs when submitting merchant applications violate the Card Brand Rules. (*Id.* ¶ 67.)

### 4.   *Defendants' Right to Terminate*

There is no dispute the Agreement states Plaintiff's right to receive Residuals is terminated where Defendants terminate the Agreement pursuant to sections 18(b)(ii)-(iii). (*Id.* ¶¶ 68-70.) Those sections permit *immediate* termination where Plaintiff was involved in or facilitated: (1) repeated violations of the Card Brand Rules; or (2) fraudulent activity. (*Id.*) Upon termination for either reason, Defendants' obligation to make Residual payments to Plaintiff ceases. (*Id.* ¶ 70.)

### 5.   *Choice of Law and Attorneys' Fees*

The Agreement is "governed by and construed in accordance with the laws of the State of New York without giving effect to its conflict of law principles." (*Id.* ¶ 71.) Moreover, the prevailing party in any litigation regarding the Agreement is "entitled to recover its reasonable attorneys' fees and costs . . . ." (*Id.*)

## C.   **Plaintiff's Breaches of the Card Brand Rules and the Agreement**

It is undisputed that Plaintiff breached the Card Brand Rules and Agreement in myriad ways. Most seriously, Plaintiff does not—and cannot—dispute it: (1)

---

[8] The Card Brands use four-digit merchant category codes ("MCC") to classify merchants by the good or services they sell. MCCs are sometimes (incorrectly) referred to as "standard industrial classifications" ("SIC"). SICs are for governmental use, and the codes and descriptions are different. (*Id.* ¶ 66.)

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

boarded merchants who sold kratom and CBD; (2) boarded merchants engaged in fraudulent conduct; (3) instructed merchants to provide false information on merchant applications; and (4) knowingly submitted applications to FDMS containing material false information.

## 1. *The G2 and Visa Detections.*

Prior to termination of the Agreement, FDMS engaged G2 to monitor merchant accounts and identify merchants engaged in activity that was illegal and/or brand-damaging or otherwise against the Card Brand Rules. (*Id.* ¶ 72.) FDMS provided G2 with a list of all merchants processing with FDMS, whether in Plaintiff's Portfolio or not, along with the website URL from each of the merchants' applications. (*Id.*) If the merchant did not provide a URL, G2 would try to find one for screening purposes. (*Id.*) G2 also maintained a list of URLs known to sell illegal or brand-damaging products. (*Id.* ¶ 73.) G2 performed ongoing screening of each URL and conducted test transactions to identify content sold through the websites that was illegal or brand-damaging. (*Id.*) As part of this process, G2 would attempt to purchase illegal or brand-damaging products from a website (with full knowledge that the card issuer would decline the transaction) and then trace the transaction by comparing the transaction information with FDMS's files. (*Id.*) When G2 found merchants processing with FDMS engaged in fraudulent or illegal activity, G2 would notify FDMS via an online portal. (*Id.*)

In January 2017, FDMS began receiving notifications from G2 about Plaintiff's merchants. (*Id.* ¶ 74.) From January through November 2017, G2 identified 16 merchant accounts Plaintiff boarded who were engaged in illegal, brand-damaging, and/or fraudulent activity. (*Id.* ¶ 75.) Of those 16 accounts, most were selling kratom and some were selling CBD. (*Id.* ¶ 76.) Most of these merchants utilized websites for these transactions that were different than the websites disclosed to Defendants but would submit the transactions from those

10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69623096.12

websites through their merchant account.[9] (*Id.* ¶ 77.) Moreover, none of the merchants disclosed these products on their merchant applications, and none were authorized to process these sales. (*Id.* ¶ 79.) Accordingly, these merchants were either directly (and fraudulently) selling illegal and/or brand-damaging products or factoring. (*Id.* ¶ 80.) G2 eventually identified 11 more accounts, for a total of 27, that were engaged in similar activity. (*Id.* ¶ 81.)

Additionally, on or about October 30, 2017, Visa notified FDMS of a Green Payment merchant engaged in activity law enforcement found was illegal and/or brand damaging. (*Id.* ¶ 82.)

> ### 2. *FDMS confirmed accounts of merchants Plaintiff boarded were used to sell illegal and/or brand-damaging products.*

FDMS confirmed G2's findings and determined Plaintiff boarded numerous merchants whose accounts were used to sell kratom and CBD through undisclosed websites, which was illegal and/or brand-damaging activity and therefore prohibited by the Card Brand Rules. (*Id.* ¶ 83.)

Moreover, unbeknownst to Defendants, Plaintiff was known as a "go-to" ISO for merchants who sold these types of illegal and/or brand-damaging products. For example, merchant Timothy Haywood was referred to Plaintiff when he was looking for a solution to process kratom sales. Jesse Cretaro told Mr. Haywood he could get him "approved for processing for kratom sales" and that "Green Payment had merchants that sell kratom." (*Id.* ¶ 84.) Green Payment merchant Nate Weinberg routinely referred other merchants who sold CBD and similar products to Plaintiff. (*Id.* ¶ 85.) In addition to regularly receiving referrals from other

---

[9] For example, the merchant ESPY Distro, LLC disclosed the website www.espydistro.com to Defendants, but G2 completed a test transaction where this merchant account was used to sell kratom through the website http://www.jacksonkratom.com. (*Id.* ¶ 78.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69623096.12

1  merchants, Plaintiff actively solicited multiple unqualified merchants. (*Id.* ¶ 86.)

2  The Green Payment sales agent associated with most of the merchants G2

3  identified was Jesse Cretaro. (*Id.* ¶ 87.) At all relevant times, Plaintiff was aware of

4  and responsible for Cretaro's conduct. (*Id.* ¶ 88.) And not only was Plaintiff

5  contractually responsible for Cretaro's actions, Plaintiff's principal, Richard Cha,

6  and other Green Payment employees were well aware of Cretaro's improper

7  conduct. (*Id.* ¶ 89.)

8      3.    *FDMS confirmed Plaintiff boarded numerous merchants that*

9          *were engaged in fraudulent conduct.*

10  After receiving the G2 and Visa detections, FDMS confirmed Plaintiff

11  boarded numerous merchants engaged in fraudulent conduct, either by selling

12  illegal products not disclosed on their merchant applications or factoring. (*Id.* ¶

13  90.) FDMS reviewed the G2 notifications and test transactions and confirmed that

14  11 merchants were using a different, undisclosed URL for the transactions. (*Id.* ¶

15  91.) FDMS also confirmed Plaintiff's merchants' accounts were used to sell

16  kratom and CBD, which were not disclosed on their merchant applications. (*Id.* ¶

17  92.)

18      4.    *Plaintiff instructed merchants to provide false or misleading*

19          *information.*

20  Not only did Plaintiff solicit and board merchants engaged in illegal, brand-

21  damaging, and/or fraudulent activity, Plaintiff instructed many of these merchants

22  how to avoid detection by Defendants. (*Id.* ¶ 93.) Although there are countless

23  examples in Plaintiff's documents and employees' testimony, the following

24  provides an illustrative list:

25  • When discussing a merchant application, Green Payment employee Ana

26    Ferrer-Jenkins told Cretaro to instruct the merchant to "take down merch or

27    ads that advertise weed or vaping to prevent red flagging." (*Id.* ¶ 94.)

28

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

- Cretaro told a merchant not to list a phone number used on the merchant's actual website so information submitted to FDMS would not match. (*Id.* ¶ 95.)

- Cretaro instructed multiple merchants to create fake marketing materials to provide FDMS that avoided advertising CBD and kratom sales. (*Id.* ¶ 96.)

- Cretaro told a merchant to use the merchant's wife's name on his application because the merchant was "inextricably linked to Kratom." (*Id.* ¶ 97.)

- Cretaro told a merchant to provide a different phone number because the number on the merchant application was affiliated with kratom. (*Id.* ¶ 98.)

- Cretaro advised Timothy Haywood to alter checks, alter bank documents, change his address on documents, create fake marketing materials, and use a different business name on his merchant applications. (*Id.* ¶ 99.) Even after his account and back-up accounts had all been terminated, Cretaro instructed Haywood how to set up a new merchant account with FDMS to attempt to avoid detection. (*Id.* ¶ 100.) In particular, Cretaro instructed Haywood to have his wife fill out the merchant application in her name to prevent FDMS from rejecting the application (due to prior termination of Haywood's merchant account for the sale of kratom). (*Id.*) Cretaro also instructed Heywood to submit the application as a website for selling clothing, but the real purpose was to use the merchant account for kratom sales. (*Id.*).

- Cretaro told Nate Weinberg, principal of multiple Green Payment merchants, to use a different LLC that was not linked to CBD and to lie about what the LLC was selling after another processor terminated one of Weinberg's businesses, because the application would not be approved if the LLC was linked to CBD. (*Id.* ¶ 101.)

This list is not exhaustive and includes but a few examples of the abundant evidence that Plaintiff instructed merchants to provide false or misleading

13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69623096.12

information in violation of the Card Brand Rules and Agreement.

> 5. *Plaintiff knowingly submitted merchant applications containing false or misleading information to Defendants.*

Along with instructing merchants how to mislead Defendants, Plaintiff itself provided false information. For example:

- Plaintiff submitted multiple merchant applications to FDMS that were "manipulated" to "disguise the business entity." (*Id.* ¶ 102.)
- Plaintiff submitted multiple merchant applications to FDMS that did not contain complete, truthful information. (*Id.* ¶ 103.)
- Plaintiff used incorrect MCC or SIC codes. For example, Plaintiff coded CBD merchants as "miscellaneous and specialty retail stores" or "miscellaneous food stores." (*Id.* ¶ 104.)

These examples are merely a small sampling of the plethora of evidence that Plaintiff knowingly submitted false and misleading information to Defendants.

> 6. *Prior to termination, multiple employees notified Richard Cha of Plaintiff's submitting false information to Defendants.*

Well before the Agreement was terminated, Green Payment employees James Conrad and Ted Lee were concerned about Plaintiff's submission of false information to Defendants. (*Id.* ¶ 105.) Conrad was uncomfortable specifically because merchant applications were being "manipulated." (*Id.* ¶ 106.) Conrad discussed his concerns directly with Plaintiff's CEO, Richard Cha. (*Id.* ¶ 107.) Plaintiff did nothing to address Conrad's concerns. (*Id.* ¶ 108.) Moreover, Plaintiff had no procedure in place to trigger an investigation based on merchant terminations. (*Id.* ¶ 109.)

> 7. *FDMS notified Plaintiff of the G2 detections months before termination.*

For months before the Agreement was terminated, upon deciding to close a

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

merchant account based on FDMS's confirmation of a G2 detection, FDMS notified Plaintiff of the closure of each unqualified or illegal merchant account and the reason for it. (*Id.* ¶ 110.) Despite receiving these repeated notifications, Plaintiff did absolutely nothing to investigate who was involved in the boarding of these merchants or whether there were additional merchants in its Portfolio engaged in similar illegal and/or brand-damaging businesses and in fact *continued* to board such merchants. (*Id.* ¶ 111.)

### D. Defendants terminated the Agreement.

From January to November 2017, Plaintiff submitted approximately 100 merchant applications, and, as of November 14, 2017, had approximately 500 merchants in its Portfolio. (*Id.* ¶ 112.) Thus, the 16 G2 detections represented 16% of the accounts boarded from January to November 2017 and 3.2% of Plaintiff's total Portfolio. (*Id.* ¶ 113.) FDMS viewed this as an alarmingly high number of merchants engaged in illegal, brand-damaging, and/or fraudulent activity, particularly given the short timeframe and small size of Plaintiff's Portfolio. (*Id.* ¶ 114.) Moreover, the Card Brands may fine FDMS when its merchants violate the Card Brand Rules. (*Id.* ¶ 116.) Thus, FDMS took this issue very seriously.

Accordingly, on November 14, 2017, after confirming that the merchant accounts G2 identified that were boarded by Plaintiff had in fact engaged in the sale of illegal and/or brand-damaging products and/or factoring, FDMS decided to terminate the Agreement because of repeated violations of the Card Brand Rules and fraudulent activity.[10] (*Id.* ¶ 117.) On November 29, 2017, FDMS sent the

---

[10] Plaintiff has alleged Defendants used a "pretext" to terminate the Agreement because Plaintiff wanted to negotiate higher Residual rates in November 2017. Not only is this untrue, it is irrelevant. As discussed in detail above, it is *undisputed* Plaintiff repeatedly violated the Card Brand Rules and engaged in fraudulent conduct. Therefore, it is *undisputed* Defendants had the right to terminate the Agreement and withhold Plaintiff's Residuals regardless of whether Plaintiff

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69623096.12

1   formal notice of termination to Plaintiff, citing sections 18(b)(ii), (b)(iii) and

2   (b)(ix) of the Agreement as the bases for the termination.[11] (*Id.* ¶ 118.) Because

3   Defendants terminated Plaintiff for repeated violations of the Card Brand Rules

4   (section 18(b)(ii)) and fraudulent activity (section 18(b)(iii)), they withheld

5   Plaintiff's Residuals.

6       This lawsuit followed.

7   **III.   LEGAL STANDARD**

8       "The court shall grant summary judgment if the movant shows that there is

9   no genuine dispute as to any material fact and the movant is entitled to judgment as

10  a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is particularly

11  appropriate where the plaintiff cannot establish an essential element of its claim.

12  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)

13  (on summary judgment, "the moving party must either produce evidence negating

14  an essential element of the nonmoving party's claim or defense or show that the

15  nonmoving party does not have enough evidence of an essential element to carry

16  its ultimate burden of persuasion at trial."); *see also Celotex Corp. v. Catrett*, 477

17  U.S. 317, 323 (1986) (the moving party is entitled to summary judgment when the

18  nonmoving party has failed to make a sufficient showing on an essential element of

19  its case with respect to which it has the burden of proof).

20  **IV.   ARGUMENT**

21      **A.   Breach of Contract**

22      The Court should grant summary judgment on Plaintiff's breach-of-contract

23  sought higher compensation around the time of the decision to terminate.

24  [11] The termination letter was over-inclusive and stated that Plaintiff had "boarded

25  *approximately* 57 high risk merchant accounts . . . ." (*Id.* ¶ 119.) Defendants

26  actually terminated Plaintiff due to the 17 verified G2 and Visa notifications under

    the very provisions of the Agreement cited in the letter. (*Id.* ¶ 120.) The examples

27  of accounts provided in the letter were not correct. (*Id.* ¶ 121.)

28  
16
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

claim because the undisputed evidence clearly shows Plaintiff, not Defendants, breached the Agreement. Due to Plaintiff's repeated violations of the Card Brand Rules and its fraudulent conduct, Defendants properly terminated the Agreement and ceased paying Plaintiff Residuals.

### 1. *Defendants properly terminated the Agreement.*

Plaintiff claims Defendants breached the Agreement because they purportedly (1) failed to give Plaintiff notice and an opportunity to cure Plaintiff's breaches and (2) used Plaintiff's breaches as a pretext to terminate the Agreement for cause. But the undisputed facts clearly establish Defendants properly terminated the Agreement in accordance with its express terms.

The Agreement could not be clearer. It permits Defendants to terminate *immediately* for cause if:

- Plaintiff repeatedly breaches the Card Brand Rules (section 18(b)(ii)); *or*
- Plaintiff engages in fraudulent conduct (section 18(b)(iii)).

It is undisputed that Plaintiff did both. Plaintiff's owner, Richard Cha, *admitted* at the Rule 30(b)(6) deposition of Plaintiff that the sale of kratom violates the Card Brand Rules and that he was aware of this during the relevant time period.[12] (SOF ¶ 57,) Thus, the Court need go no further. By this admission alone, Plaintiff has conceded it repeatedly violated the Card Brand Rules, and Plaintiff's breach-of-contract claim fails. Regardless, there is ample additional undisputed evidence that Plaintiff repeatedly violated the Card Brand Rules *and* engaged in fraudulent conduct.

### a. Plaintiff repeatedly violated the Card Brand Rules.

The Card Brand Rules expressly prohibit boarding merchants that:

---

[12] In fact, as early as the beginning of 2017, Plaintiff sent notices to its merchants that the sale of kratom and CBD violated the Card Brand Rules. (*Id.* ¶ 59.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

- submit illegal and/or brand-damaging transactions; *or*

- engage in fraudulent conduct, including but not limited to factoring. (*Id.* ¶¶ 48, 49.)

At all relevant times, the commercial sale of CBD was illegal under federal law[13] and kratom was illegal under the law of several states and cities.[14] Moreover, the Card Brands themselves specifically regarded kratom as "illegal and/or brand-damaging" under their Rules, including but not limited to Visa Rules 1.5.1.4 and 1.10.1.3 and Mastercard Rules 1.13.2, 3.7, and 5.11.7. Consistent with these Rules, Visa sent FDMS numerous violation notices specifically for the conduct of Plaintiff's merchants selling kratom. (SOF ¶ 110.) Thus, the Card Brand Rules prohibit boarding merchants that sell kratom or CBD or that engage in any type of fraudulent conduct—such as selling products they are not permitted to sell, using undisclosed websites to sell illegal products, or factoring. (*Id.* ¶¶ 48, 49.)

It is undisputed that Plaintiff boarded merchants whose accounts were used to sell kratom and CBD, both of which were brand-damaging under the Card Brand Rules and illegal during the relevant time period. (*Id.* ¶¶ 48-59.) Again, Plaintiff has *admitted* the sale of kratom violates the Card Brand Rules. Each time Plaintiff boarded one of the 16 merchants that sold either of these products, Plaintiff violated the Card Brand Rules prohibiting the sale of brand-damaging and illegal products and exposed FDMS to significant fines. (*Id.* ¶¶ 48-59, 116.)

---

[13] *See* 21 U.S.C. §§ 802(16), 812 (classifying "all parts of the plant *Cannabis sativa L.*" including "every compound" of the plant as a Schedule I drug); *United States v. Mallory*, 372 F.Supp.3d 377, 381 (S.D. W.V. 2019) ("CBD is a derivative product of the *Cannabis sativa L.* plant.")

[14] *See, e.g.*, Ala. Code § 20-2-23(4)(b)(322) (Alabama); Ark. Code Ann. § 5-64-201; Ark. Admin. Code 007.07.2 (Arkansas); IC 35-31.5-2-321(1)(HHH) (Indiana); W.S.A. § 961.14 (7)(L)(mk) (Wisconsin); VT ADC 12-5-23:4.0 (Vermont); 22-B DC ADC§ 1201(h)(16) (District of Columbia).

18
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

It is further undisputed Plaintiff boarded numerous merchants that engaged in fraudulent activity, including but not limited to factoring. For example, at least one merchant opened a merchant account through a shell business that purported to sell clothing, but actually used the merchant account to sell kratom. (*Id.* ¶ 122.) Moreover, none of the merchants whom FDMS confirmed were selling kratom or CBD disclosed those products on their merchant applications, so *all* of them were engaged in fraudulent conduct. (*Id.* ¶ 79.) Importantly, boarding a merchant engaged in this type of conduct is an automatic violation of the Card Brand Rules as both fraudulent and brand-damaging activity. (*Id.* ¶ 64.)

Put simply, Plaintiff does not—and cannot—dispute that the sale of kratom and CBD were processed through the accounts of numerous merchants Plaintiff boarded. Accordingly, the merchants were either selling illegal and/or brand-damaging products directly or engaged in fraudulent activity (*i.e.*, factoring). *Either way*, the boarding of those merchants violated the Card Brand Rules (as Plaintiff itself concedes). This is all the Court need consider. Plaintiff's repeated violations of the Card Brand Rules justified Defendants' immediate termination of the Agreement and their withholding of Plaintiff's Residuals. (*Id.* ¶ 68-70.)

### b.  Plaintiff engaged in fraudulent conduct.

Not only is it undisputed Plaintiff violated the Card Brand Rules, it is likewise undisputed Plaintiff engaged in fraudulent conduct. Plaintiff's *own employees* complained about Plaintiff's submitting false and misleading information to Defendants. (*Id.* ¶¶ 105-109.) And the documents Plaintiff produced in discovery make clear Plaintiff consistently conspired with merchants to deceive and mislead Defendants. (*Id.* ¶¶ 93-101.)

Therefore, it is undisputed that Defendants had a second, independent basis to terminate the Agreement immediately and withhold Plaintiff's Residuals. (*Id.* ¶¶ 66-69.) Again, the Court need go no further.

19
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

2.   *Defendants properly withheld Plaintiff's Residuals.*

Defendants properly terminated the Agreement *and* properly withheld Plaintiff's Residuals. The Agreement provides that Plaintiff's right to receive Residuals ceases immediately upon termination for:

- Plaintiff's repeated violations of the Card Brand Rules; *or*
- fraudulent activity by Plaintiff. (*Id.* ¶¶ 68-69)

Defendants terminated the Agreement for both reasons. (*Id.* ¶¶ 117, 118.) Accordingly, Defendants properly ceased paying Plaintiff Residuals.

3.   *Plaintiff cannot prove an essential element of its claim.*

Not only did Defendants properly terminate the Agreement and cease paying Plaintiff ongoing Residuals, Plaintiff cannot prove it performed its obligations under the Agreement, which is an essential element of its claim. *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 872 (N.Y. Sup. Ct. 2015).

It is undisputed Plaintiff boarded merchants that either sold unqualified and illegal products or were factoring; Plaintiff instructed merchants to provide Defendants false and misleading information; and Plaintiff submitted false and misleading merchant applications to Defendants. (*See supra* Sections II.C.1-3.) All of these are breaches of the Card Brand Rules and Agreement.

It is also undisputed that Plaintiff breached the Agreement in many other ways. For example, it is undisputed that, although Plaintiff utilized Mr. Cretaro as an independent contractor, Plaintiff did not have a written agreement with him for a substantial period of time and, when Plaintiff did sign a contract with him, the contract did not comply with the requirements set forth in the Agreement. It is also undisputed that Plaintiff failed to verify the merchants it boarded were conducting legal, bona fide businesses. It is further undisputed that Plaintiff failed to comply with all Program Standards.

As such, Plaintiff cannot establish it was in compliance with the Agreement

20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

1    and therefore cannot prevail on its breach-of-contract claim.

2        **B.    Conversion**

3            Plaintiff's conversion claim, like its breach-of-contract claim, is based on

4    Plaintiff's allegation that Defendants wrongfully withheld Plaintiff's Residuals

5    after they terminated the Agreement. The Court should dismiss the conversion

6    claim for two reasons: (1) conversion cannot be predicated on a breach of contract;

7    and (2) Plaintiff has no legal right to the post-termination Residuals.

8            First, a conversion claim cannot be predicated on a mere breach of contract.

9    *East End Labs., Inc. v. Sawaya*, 914 N.Y.S.2d 250 (N.Y. App. Div. 2010);

10   *Farmers Ins. Exch. v. Zerin*, 61 Cal. Rptr. 2d 707 (Cal. Ct. App. 1997). Summary

11   judgment on a conversion claim is therefore appropriate when the plaintiff cannot

12   show "the defendant engaged in tortious conduct separate and apart from any

13   alleged failure to fulfill its contractual obligations." *Brown v. Kristal Auto Mall

14   Corp.*, 53 N.Y.S.3d 180, 181 (N.Y. App. Div. 2017). Here, the only basis for

15   Plaintiff's conversion claim is that Defendants withheld its Residuals. Moreover,

16   Plaintiff's right to Residuals is governed by the Agreement. Plaintiff has failed to

17   even allege Defendants engaged in any conduct separate and apart from the alleged

18   failure to fulfill their contractual obligations. This, alone, is sufficient to defeat

19   Plaintiff's conversion claim.

20           Second, Plaintiff cannot prove legal ownership of or an immediate right of

21   possession to the Residuals. *Giardini v. Settanni*, 70 N.Y.S.3d 57 (N.Y. App. Div.

22   2018); *see also Lee v. Hanley*, 191 Cal. Rptr.3d 536, 548 (Cal. 2015) (noting "the

23   plaintiff's ownership or right to possession of the property" is an element of

24   conversion). As explained above, because Defendants properly terminated the

25   Agreement under sections 18(b)(ii) and (b)(iii), Plaintiff has no right to post-

26   termination Residuals. (*See* Section IV.A.2.) This claim fails as a matter of law.

27       **C.    Intentional Interference with Prospective Economic Relations**

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

1       Plaintiff alleges Defendants interfered with Plaintiff's "contractual

2   relationships" with boarded merchants, which ultimately "prevent[ed] [Plaintiff]

3   from referring these merchants to alternate processors who would compensate

4   [Plaintiff] . . . ." (SOF ¶ 123.) elements of a claim for tortious interference with a

5   prospective economic advantage are: (1) the defendant interfered with a business

6   relationship between the plaintiff and a third party; (2) with the sole purpose of

7   either harming the plaintiff, or by means which are dishonest, unfair or otherwise

8   improper; and (3) the plaintiff would have entered into a contract with the third

9   party but for the defendant's interference. *Cumisky v. James River Corp.*, Civ.A.

10   No. CV-93-1975 (DGT), 1995 WL 520021, *4 (E.D.N.Y. Aug. 17, 1995); *see also*

11   *Korea Supply Co. v. Lockheed Martin Corp.*, 131 Cal.Rptr.2d 29, 54 (Cal. 2003)

12   (discussing elements of intentional interference claim under California law). The

13   Court should dismiss this claim for three reasons.

14       First, Plaintiff did not have a contractual relationship with boarded

15   merchants. In fact, the Agreement expressly prohibited Plaintiff from entering into

16   contracts with merchants related to Defendants. (SOF ¶ 124.) As such, any

17   economic relationship between Plaintiff and a merchant would have been a breach

18   of the Agreement. Moreover, Plaintiff does not allege any such contract existed.

19       Second, the harm Plaintiff alleges was permitted under the contract *and* did

20   not actually occur. Plaintiff alleges it suffered economic harm because Defendants

21   somehow prevented it from referring merchants to alternative processors. (*Id.* ¶

22   123.) But the Agreement prohibited Plaintiff from referring merchants in its

23   portfolio to other processors after termination for 36 months. (*Id.* ¶ 125.)

24   Regardless, the evidence shows that, despite its clear contractual obligations (and

25   prohibitions against doing so), Plaintiff actively and successfully boarded

26   merchants with other processors after Defendants terminated the Agreement. (*Id.* ¶

27   126.) Plaintiff, therefore, did not suffer the harm it alleges. *See Penn Warranty*

22

28

1  *Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 815 (N.Y. Sup. Ct. 2005) (a plaintiff must

2  identify third parties who were prevented from entering into a business relationship

3  with plaintiff); *Satmodo, LLC v. Whenever Communications, LLC*, No. 17-cv-

4  0192-AJB NLS, 2017 WL 1365839, * 9 (S.D. Cal. Apr. 14, 2017) (same).

5        Finally, Plaintiff cannot establish Defendants' conduct was motivated solely

6  by malice. *See KAM Constr. Corp. v. Bergey*, 56 N.Y.S.3d 740 (N.Y. App. Div.

7  2017) (plaintiff must show conduct was motivated solely by malice or to inflict

8  injury by unlawful means); *see also Korea Supply Co.*, 131 Cal.Rptr.2d at 50 (an

9  "act is independently wrongful if it is unlawful"). Plaintiff alleges Defendants

10  "fabricated" Plaintiff's violations of the Agreement as a "pretext" for termination

11  "in response to Green Payment's attempt to negotiate better rates with Defendants

12  and in anticipation of Green Payment's likely non-renewal of the Marketing

13  Agreement." (SOF ¶ 127). But, according to Plaintiff, the discussion about rates

14  and termination occurred "on or about November 1, 2017." (*Id.* ¶ 128.) FDMS

15  began receiving G2 notifications of Plaintiff's conduct in January 2017. (*Id.* ¶ 74.)

16  And, on October 11, 2017 FDMS noticed there was a "possible issue" with

17  Plaintiff's portfolio. (*Id.* ¶ 129.) Clearly then, FDMS's concern with Plaintiff's

18  pattern of boarding unqualified merchants was genuine and not malicious.

19        **D.**    **UCL**

20        The Court should see Plaintiff's Unfair Competition ("UCL") claim for what

21  it is: a backup to its breach-of-contract and tort claims. The California Supreme

22  Court has expressly held this is inappropriate: "An action under the UCL is not an

23  all-purpose substitute for a tort or contract action." *Korea Supply Co.*, 131

24  Cal.Rptr.2d at 42–43. As such, California courts have avoided interpretations of

25  the UCL that permit plaintiffs to use the UCL as "an all-purpose substitute for a

26  tort or contract action" because that is "something the Legislature never intended."

27  *Id.* Yet this is precisely what Plaintiff seeks to do here.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

Regardless, under the UCL, a plaintiff can only "recover profits unfairly obtained to the extent that these profits represent monies" that the plaintiff gave the defendant *or* that the plaintiff has an ownership interest in. *Id.* at 947. Here, Plaintiff does not allege to have given Defendants any money. Instead, Plaintiff's restitution claim can only survive if it has a "vested interest in the money it seeks to recover." *Korea Supply Co.*, 131 Cal. Rptr. 2d at 42. But, as explained above, Plaintiff had no legal interest in the post-termination Residuals under the Agreement. (*See* Section IV.A.2.) Accordingly, this claim fails.

**E.  Accounting**

The Court should dismiss Plaintiff's accounting claim because: (1) the parties had a contractual, not fiduciary, relationship; (2) Plaintiff has an adequate remedy at law; and (3) Plaintiff never made a demand for an accounting.

First, "[t]he right to an accounting is premised upon the existence of a confidential or fiduciary relationship" and a breach of that duty. *Ctr. for Rehab. and Nursing at Birchwood, LLC v. S & L Birchwood, LLC*, 939 N.Y.S.2d 78 (N.Y. App. Div. 2012); *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1191 (N.D. Cal. 2009) (accounting is a "rare" claim that arises when a defendant has a fiduciary duty to a plaintiff). Courts will dismiss an accounting claim when no fiduciary duty exists. *See id.; Elghanian v. Elghanian*, 717 N.Y.S.2d 54 (N.Y. App. Div. 2000); *see also Jolley v. Chase Home Fin., LLC*, 153 Cal.Rptr.3d 546 (Cal. Ct. App. 2013). The breach of fiduciary duty must be "independent of the contract itself." *Morgenroth v. Toll Bros.*, 876 N.Y.S.2d 378, 380 (N.Y. App. Div. 2009). Plaintiff fails to allege it had a confidential or fiduciary relationship with Defendants—nor can it, as none existed. (SOF ¶ 130.)

Further, an accounting claim requires there be "no adequate remedy at law." *Unitel Telecard Distrib. Corp. v. Nunez*, 936 N.Y.S.2d 17 (N.Y. App. Div. 2011); *Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1207 (E.D. Cal.

24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

1   2013). Here, there is a valid and enforceable contract—and if Plaintiff had any

2   damages (it does not), its damages could be satisfied with monetary relief.

3   Finally, there is no evidence or allegation Plaintiff made a demand for an

4   accounting. Absent a demand for an accounting and subsequent refusal, there is no

5   basis for an accounting claim. *McMahan & Co. v. Bass*, 673 N.Y.S.2d 19 (N.Y.

6   App. Div. 1998). For these reasons, Plaintiff's accounting claim fails.

7   ### F.   Declaratory Relief

8   Plaintiff's claim for declaratory relief must be dismissed because it is

9   entirely duplicative of Plaintiff's breach-of-contract claim. "A cause of action for a

10  declaratory judgment is unnecessary and inappropriate when the plaintiff has an

11  adequate, alternative remedy in another form of action, such as breach of contract."

12  *Ciambrone v Metropolitan Life Ins. Co.*, No. 657016/2017, 2019 WL 854597, at

13  *2 (N.Y. Sup. Ct. Feb. 22, 2019).

14  Here, Plaintiff seeks declaratory relief regarding the parties' "respective

15  rights and obligations under the Marketing Agreement, specifically whether

16  Defendants wrongfully terminated the Marketing Agreement for cause, and

17  whether Green Payment is entitled to residuals . . . ." (SOF ¶ 131.) In other words,

18  Plaintiff seeks a declaration that Defendants breached the Agreement. But this

19  issue will be determined with the resolution of Plaintiff's breach-of-contract claim.

20  Thus, it is wholly superfluous and should be dismissed. *Ciambrone*, 2019 WL

21  854597, at *2 (dismissing declaratory relief claim because it "effectively [sought]

22  the same relief as that demanded in the breach of contract" claim).

23  ## V.   CONCLUSION

24  The evidence is undisputed. Plaintiff's conduct was abhorrent and more than

25  justified Defendants' termination for cause as a matter of law. Accordingly,

26  Plaintiff's claims should be dismissed with prejudice and Defendants awarded their

27  costs and attorneys' fees.

28

25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

1

Dated:  July 22, 2019                    POLSINELLI LLP

2

3

4                                   By:  /s/ John W. Peterson

5                                          John W. Peterson

6                                   Attorneys for Defendants First Data
                                    Merchant Services LLC and Wells Fargo
7                                   Bank, N.A.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12

1

**CERTIFICATE OF SERVICE**

2        The undersigned hereby certifies that on July 22, 2019, a copy of the

3  foregoing document was served via the Court's Electronic Filing System pursuant

4  to Local Rule 5-3.2.1 and via U.S. Mail as follows:

5

6            Eugene Rome
             erome@romeandassociates.com

7            Sridavi Ganesan
             sganesan@romeandassociates.com

8            Rome & Associates, A.P.C.
             2029 Century Park East, Suite 450

9            Los Angeles, California 90067

10

11                             /s/ John W. Peterson
                             John W. Peterson

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69623096.12