POLSINELLI LLP
JOHN W. PETERSON (SBN: 179343)
john.peterson@polsinelli.com
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone:   (615) 259-1510
Facsimile:    (615) 259-1573

Attorneys for Defendants First Data Merchant Services
LLC and Wells Fargo Bank, N.A.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREEN PAYMENT SOLUTIONS, LLC,<br><br>                              Plaintiff,<br><br>         v.<br><br>FIRST DATA MERCHANT SERVICES CORPORATION; WELLS FARGO BANK, N.A.; and DOES 1 to 100,<br><br>                              Defendants. | Case No. 2:18-cv-1463 DSF (ASx)<br><br>**DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF  MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      August 26, 2019<br>Time:      1:30 p.m.<br>Ctrm:      7D<br>Judge:     Hon. Dale S. Fischer |
| FIRST DATA MERCHANT SERVICES LLC and WELLS FARGO BANK, N.A.,<br><br>                    Counter-Plaintiffs,<br><br>         v.<br><br>GREEN PAYMENT SOLUTIONS, LLC,<br><br>                    Counter-Defendant. | |

Pursuant to Local Rule 56-1 and this Court's Order Re Motions for Summary Judgment, Defendants First Data Merchant Services LLC ("FDMS") and Wells Fargo Bank, N.A. ("Wells Fargo") (together, "Defendants") submit this Statement of Uncontroverted Facts and Conclusions of Law in support of their Motion for Partial Summary Judgment:

## I.   STATEMENT OF UNCONTROVERTED FACTS

### A.   Background

| Undisputed Facts | Supporting Evidence |
|---|---|
| 1.   To accept debit or credit card payments, merchants must establish contractual relationships with "Acquirers" or "Card Processors." | **Ex. 1**, ECF No. 1-1 Excerpt of Complaint ("Compl.") ¶ 10; **Ex. 2**, Declaration of Louis Sablich ("Sablich Decl.") ¶ 3). |
| 2.   Acquirers or Card Processors agree to sponsor merchants into "Card Brand Networks" established by "Card Brands" like Visa and Mastercard. | **Ex. 1**, Compl. ¶ 10; **Ex. 2**, Sablich Decl. ¶ 3. |
| 3.   Acquirers and Card Processors often contract with independent sales organizations ("ISOs") to sell their processing services to merchants. | **Ex. 1**, Compl. ¶ 11; **Ex. 2**, Sablich Decl. ¶ 3. |
| 4.   Depending on the ISO's agreement with the Acquirer or Card Processor, when an ISO solicits a merchant, the ISO may submit a completed merchant application to the | **Ex. 1**, Compl. ¶ 11;  **Ex. 2**, Sablich Decl. ¶ 3. |

| | | |
|---|---|---|
| 1 | Acquirer or Card Processor. | |
| 2<br>3<br>4 | 5. If approved, the merchant then contracts directly with the Acquirer or Card Processor. | *See, e.g.,* **Ex. 2**, Sablich Decl. Ex. Q. |
| 5<br>6<br>7<br>8<br>9 | 6. Acquirers and Card Processors rely on ISOs to provide true and accurate information on the merchant applications submitted for the review and underwriting process. | **Ex. 2**, Sablich Decl. ¶ 3. |
| 10<br>11<br>12<br>13<br>14 | 7. The process of an ISO submitting a merchant application and the merchant contracting with an Acquirer or Card Processor is known as "boarding." | **Ex. 2**, Sablich Decl. ¶ 3. |
| 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 | 8. Here, Wells Fargo, an Acquirer, and FDMS, a Card Processor, contracted with Plaintiff, an ISO, for Plaintiff to solicit merchants for their Program and board those merchants to process with them. The Agreement defines "Program" as Defendants' "program of Merchant participation in the Bank Card systems described in the Merchant Agreement." | **Ex. 1**, Compl. ¶ 12; **Ex. 2**, Sablich Decl. Ex. S § 1. |
| 25 | **B. The Marketing Agreement** | |
| 26<br>27 | 9. Defendants entered into a Marketing Agreement with Plaintiff on | **Ex. 1**, Compl. ¶ 13; **Ex. 2**, Sablich Decl. Ex. S. |
| 28 | | |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO. 2:18-CV-1463

68811499.15

| | |
|---|---|
| March 24, 2011. | |
| 10.    Plaintiff agreed to serve as an ISO for Defendants and to market Defendants' Program to prospective merchants in accordance with the express terms of the Agreement. | **Ex. 2**, Sablich Decl. Ex. S; **Ex. 1**, Compl. ¶ 13. |
| 11.    In exchange, Plaintiff received monthly "Residuals," calculated as a percentage of the processing fees for the merchants it boarded with Defendants, which together formed Plaintiff's merchant "Portfolio." | **Ex. 2**, Sablich Decl. ¶ 3, Ex. S § 9; **Ex. 1**, Compl. ¶ 13. |
| 12.    Plaintiff utilized both employees and independent contractors in soliciting and boarding merchants with Defendants. | **Ex. 3**, Excerpt of Transcript of Deposition Testimony of James Conrad, dated March 1, 2019 ("Conrad Dep.") at 20:15–21:10, 25:12 – 27:4; **Ex. 4**, Excerpt of Transcript of Deposition of Ted Lee, dated March 3, 2019 ("Lee Dep.") Dep. at 19:4 – 20:7; **Ex. 5**, Declaration of Michael Malone ("Malone Decl.") Exs.  5-7, 5-8. |
| 13.    One of Plaintiff's independent contractors was Jesse Cretaro. Mr. Cretaro contracted with Plaintiff both individually and through his limited liability company, Mensch, | **Ex. 5**, Malone Decl. Exs. 5-7, 5-8. |

3

| | |
|---|---|
| LLC. | |
| 14.    Until December 19, 2014, Plaintiff did not have a written contract with Mr. Cretaro. | *Compare* **Ex. 6**, Excerpt of Transcript of Rule 30(b)(6) Deposition of Green Payment Solutions, LLC (Richard Cha), dated February 28, 2019 ("Cha Dep."), at 121:10–14, *with* **Ex. 5**, Malone Decl. Exs. 5-94; 5-7. |
| 15.    On that date, Plaintiff entered into an initial written contract with Mr. Cretaro. | **Ex. 5**, Malone Decl. Ex. 5-7. |
| 16.    Just one month later, on or about January 22, 2015, Plaintiff entered into a new contract with Mr. Cretaro. | **Ex. 5**, Malone Decl.  Ex. 5-8. |
| 17.    Importantly,    Plaintiff's new contract with Mr. Cretaro did not require Mr. Cretaro to comply with the Card Brand Rules or the Agreement even though this was an express requirement of the Agreement | **Ex. 2**, Sablich Decl. Ex. S  § 2(i); **Ex. 5**, Malone Decl.  Ex. 5-8. |

*1.    ISO Obligations.*

| | |
|---|---|
| 18.    The Agreement required Plaintiff to comply with all "Rules," which included "*all* bylaws, rules, operational regulations, procedures, and guidelines" promulgated by the | **Ex. 2**, Sablich Decl. Ex. S §§ 1, 6. |

4

| | |
|---|---|
| Card Brands, including but not limited to the Card Brand Rules. | |
| 19. The Agreement was made subject to the Rules and Plaintiff agreed to "be bound by all applicable Rules, including the Rules pertaining to" Acquirers, Card Processors, and ISOs. | **Ex. 2**, Sablich Decl. Ex. S at § 6. |
| 20. Pursuant to the Agreement, Plaintiff (defined as "ISO" in the Agreement) and its employees and independent contractors owed Defendants (defined as "Service Providers" in the Agreement) certain obligations. | **Ex. 2**, Sablich Decl. Ex. S at 1. |
| 21. The Agreement provides: "ISO will use its best efforts to call to Service Providers' attention any information that it reasonably considers relevant to a determination of any existing or potential Merchants [sic] creditworthiness, and ISO shall follow the Program Standards in soliciting prospective Merchants." | **Ex. 2**, Sablich Decl. Ex. S § 2(c). |
| 22. The Agreement provides: "ISO shall obtain such information and take such action as Service Providers | **Ex. 2**, Sablich Decl. Ex. S § 2(e). |

5

| | |
|---|---|
| may from time to time reasonably require in connection with their processing of perspective Merchants, including: (i) Fully complete and submit to Service Providers' [sic] a Merchant Application for each prospective Merchant[.]" | |
| 23.   The Agreement states ISO shall take such action "to verify that each prospective Merchant conducts or intends to conduct a bona fide business operation, including inspecting the Merchant's premises to determine whether Merchant has the proper facilities, equipment, inventory and license or permit, if necessary, to conduct the business." | **Ex. 2**, Sablich Decl. Ex. S §2(e). |
| 24.   The Agreement provides: "ISO will use best efforts to cause each Merchant to fully pay and perform its obligations under the Merchant Agreement and to assist Service Providers in collecting any amounts owed by a Merchant from time to time." | **Ex. 2**, Sablich Decl. Ex. S § 2(f). |
| 25.   The Agreement provides: "If ISO desires to use the services of an | **Ex. 2**, Sablich Decl. Ex. S § 2(i). |

6

| | |
|---|---|
| individual independent contractor who represents himself or herself as working for ISO using ISO's legal/business name ("IC"), then ISO shall enter into a written agreement with each such IC that (i) requires the IC to comply with all applicable terms of this Agreement and all applicable Rules, laws and regulations, and (ii) prohibits the making of any representation or creating any liability on behalf of Service Providers. | |
| 26.    The Agreement provides: "ISO warrants that as of the date of submission to Service Providers the inspection report and all other information provided to Service Providers by ISO, such report and/or other information shall, to ISO's knowledge, be correct, complete, and not misleading." | **Ex. 2**, Sablich Decl. Ex. S § 2(e). |
| 27.    The Agreement provides: "ISO shall be liable to Service Providers for all Merchant Losses associated with Merchant relationships with Service Providers where the Merchant Application submitted by | **Ex. 2**, Sablich Decl. Ex. S §4(c). |

7

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9 | ISO contains significant inaccuracies or omissions (including signature by an unauthorized individual), provided that ISO had actual knowledge, or should have had knowledge based upon reasonable due diligence, of the inaccuracies or omissions at the time the Merchant Application was submitted to Service Providers." | |
| 10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26 | 28.   The Agreement provides: "ISO agrees to indemnify, defend, and hold harmless Service Providers . . . against any loss, liability, damage, penalty or expense (including attorney's fees and cost of defense) ("Damages") suffered or incurred as a result of (i) any breach of its obligations under this Agreement, (ii) any warranty or representation made by ISO to Service Providers being false or misleading, . . . (iv) any failure by ISO to fully comply with the Rules or any rules, regulations, order and requirements of any regulatory authority, (v) any fraud by ISO or any IC, (vi) any act of any IC . . . ." | **Ex. 2**, Sablich Decl. Ex. S § 16. |
| 27 | 29.   The Agreement provides: | **Ex. 2**, Sablich Decl. Ex. S §17. |
| 28 | | |

8

| | |
|---|---|
| "ISO shall reimburse Service Providers through setoff or upon demand for all fines and penalties imposed by MasterCard, VISA, Discover or any other Bank Card association with respect to which Merchants submit Transactions for processing under this Agreement or any other regulatory authority as a result of any action or inaction by ISO or any IC." | |

### 2. The Program Standards and Credit Policy

| | |
|---|---|
| 30.    The Agreement states: "ISO will comply with all Program Standards." | **Ex. 2**, Sablich Decl. Ex. S § 2(d). |
| 31.    The Agreement defines "Program Standards" as "(i) the credit criteria, standards and policies and procedures established by Service Providers and provided to ISO for ISO's use in connection with the solicitation of prospective Merchants, including <u>Schedule B</u>, which is a list of certain categories of merchants who are ***always   unacceptable*** under the Program and ***should not be solicited by ISO for the Program***; (ii) [Wells Fargo]'s branding guidelines provided | **Ex. 2**, Sablich Decl. Ex. S § 1 (emphasis added). |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| to ISO; and (iii) other policies, procedures, fines and penalties established by Service Providers and provided to ISO in writing that are designed to promote Merchant satisfaction, to preserve relationships with existing Merchants, to facilitate the growth of the Program, and to ensure the financial safety or soundness of Service Providers and their Program. Program Standards may be established or modified by Service Providers from time to time in their sole discretion." | |
| 32.   The Program Standards were drafted in part to help enforce the Card Brand Rules and to protect Defendants. | **Ex. 2**, Sablich Decl. ¶ 8. |
| 33.   The Agreement's Schedule B is incorporated into the Program Standards and identifies "categories of merchants who are ***always unacceptable*** under the Program and ***should not be solicited by ISO for the Program***". | **Ex. 2**, Sablich Decl. Ex. S at Schedule B (emphasis added). |
| 34.   The Program Standards also include "other policies, procedures, fines and penalties | **Ex. 2**, Sablich Decl. Ex. S at 3. |

10

| | |
|---|---|
| established by [Defendants] and provided to [Plaintiff] in writing that are designed to promote Merchant satisfaction, to preserve relationships with existing Merchants, to facilitate the growth of the Program, and to ensure the financial safety or soundness of Defendants and their Program." | |
| 35. Defendants could modify the Program Standards any time in their sole discretion. | **Ex. 2**, Sablich Decl. Ex. S at 3. |
| 36. Schedule B to the Agreement lists the following as "Unacceptable Business": (1) "Any illegal products/services or providing peripheral support of illegal activity," (2) "Merchants engage in activity prohibited by MasterCard and Visa," and (3) those engaged in factoring or aggregating. | **Ex. 2**, Sablich Decl. Ex. S Schedule B at 1. |
| 37. On August 30, 2011, the parties executed an amendment that replaced the Agreement's Schedule B with the FDMS Credit Policy. | **Ex. 2**, Sablich Decl. Ex. T. |
| 38. The High Risk – Tier II Merchant Pricing Amendment states "FDMS may modify Schedule B | **Ex. 2**, Sablich Decl. Ex. T at 3. |

11

| | |
|---|---|
| (FDMS Credit Policy) to the Marketing Agreement at any time upon written notice to [Plaintiff]." | |
| 39.   The FDMS Credit Policy contains a list of "UNQUALIFIED/UNACCEPTABLE BUSINESS" and states: "Do not solicit as these accounts are outside of Credit Policy Guidelines." | **Ex. 2**, Sablich Decl. Exs. C at 1, E at 1, G at 1. |
| 40.   The unacceptable and unqualified merchants identified in the FDMS Credit Policy include, but are not limited to: (i) those engaged in factoring or aggregating; (ii) those selling any "illegal products/services"; (iii) those selling "[h]erbal smoking blends and herbal incense;" (iv) those "engaged in any activity prohibited by the Card Brands"; (v) those selling "[n]utraceuticals"; and (vi) those selling "[s]ubstances designed to mimic illegal drugs (including herbal smoking blends & herbal incense)." | **Ex. 2**, Sablich Decl. Ex. C. |
| 41.   The 2015 Program Standards updated the Credit Policy, which similarly identifies "UNQUALIFIED/UNACCEPTABLE | **Ex. 2**, Sablich Decl. Ex. G. |

12

| | |
|---|---|
| BUSINESS," including but not limited to the same as those listed above that were prohibited under the earlier Credit Policy. | |
| 42.   The 2015 Credit Policy clarifies, however, that kratom is prohibited as a substance "designed to mimic illegal drugs and/or other psychoactive product[.]" | **Ex. 2**, Sablich Decl. Exs. C at 4, E at 4, G at 4. |
| 43.   In addition to identifying unqualified and unacceptable businesses Plaintiff was not permitted to sign up or board, the Program Standards also contain certain requirements with respect to Plaintiff's business operations and boarding of merchants, many of which Plaintiff failed to comply with. | **Ex. 2**, Sablich Decl. Exs. B, D, F. |
| 44.   Defendants provided written notice of the amendments to the Program Standards to Plaintiff. | **Ex. 7**, Excerpt of Deposition of Nathaniel Farkas, dated March 1, 2019 ("Farkas Dep.") at 154:1-156:3; **Ex. 6**, Cha Dep. at 81:16-21. |
| *3.     The Card Brand Rules* | |
| 45.   The Card Brands impose extensive rules that apply to every participant in the payment-card system, including but not limited to Acquirers, | **Ex. 2**, Sablich Decl. ¶ 5; **Ex. 6**, Cha Dep. at 283:21-23 (testifying that Green Payment believed it needed to comply with the Card Brand rules); **Ex. 2**, |

13

| | |
|---|---|
| Card Processors, ISOs, and merchants. | Sablich Decl. **Ex.** A-8 ("The Visa Rules govern the relationship between Visa and its Members and their agents."). |
| 46. Plaintiff agreed to be bound by all Card Brand Rules, regardless of which participant(s) a given Rule was designed to apply to. | **Ex. 2**, Sablich Decl. Ex. S § 6. |
| 47. The Card Brand Rules are generally designed to minimize the risk involved in the payment-card system and facilitate security. | **Ex. 2**, Sablich Decl. ¶ 5("VISA has established rules that are designed to minimize risks . . . . The Visa Core Rules contain fundamental rules that apply to all Visa system participants and specify the minimum requirements applicable to all Members to uphold the safety, security, soundness, integrity, and interoperability of the Visa system"). |
| 48. The Card Brand Rules prohibit illegal and/or brand-damaging transactions. | **Ex. 2**, Sablich Decl. Exs. A-1, A-2, A-3, A-4, A-5, A-6, A-9, A-10. |
| 49. The Card Brand Rules prohibit fraudulent activity. | **Ex. 2**, Sablich Decl. Exs. A-1, A-4, A-10, A-11. |
| 50. The Card Brand Rules also prohibit ISOs from repeatedly boarding merchants that engage in illegal and/or brand-damaging activity or fraud. | **Ex. 2**, Sablich Decl. ¶ 6, Ex. A-1, A-2, A-4, A-5, A-10, A-11. |

14

| | |
|---|---|
| 51.   Visa   and   Mastercard implement programs to implement and enforce   their   rules.   One   of   Visa's programs is its Global Brand Protection Program   ("GBPP").   One   of Mastercard's   programs   is   its   Business Risk   Assessment   and   Mitigation Program ("BRAM"). | **Ex. 2**, Sablich Decl. ¶ 7. |
| 52.   Although   the   word "kratom" does not appear in the text of the   Card   Brand   Rules,   at   all   relevant times,   GBPP   and   BRAM   deemed kratom   to   be   "illegal   and/or   brand-damaging"   and   therefore   prohibited under   the   Visa   and   Mastercard   Rules, including but not limited to Visa Rules 1.5.1.4   and   1.10.1.3   and   Mastercard Rules 1.13.2, 3.7, and 5.11.7. | **Ex. 2**, Sablich Decl. ¶ 9, Exs. H at 12-13, I. |
| 53.   In fact, Visa has issued a GBPP   Guide   clarifying   that   Visa deems kratom to be "brand-damaging" and  the  sale  or  facilitation  of  the sale  of  kratom  violates  Visa's  rules, including but not limited to Visa Rules 1.5.1.4 and 1.10.1.3. | **Ex. 2**, Sablich Decl. ¶ 9, Exs. H. |
| 54.   Moreover,   Visa   sent FDMS   at   least   five   rule-violation | **Ex. 2**, Sablich Decl. Exs. J-N. |

15

| | |
|---|---|
| notices because merchants Plaintiff boarded sold kratom. In each instance, Visa deemed the sale of kratom "illegal and/or brand damaging" in violation of the Visa Rules. | |
| 55.    Kratom was also illegal under the laws of several states and cities. | **Ex. 2**, Sablich Decl. ¶ 9. |
| 56.    Kratom is a plant indigenous to Southeast Asia that has psychoactive properties similar to certain illegal drugs. | **Ex. 2,** Sablich Decl. ¶ 9. |
| 57.    Prior to termination of the Agreement, CBD was illegal under federal law. | **Ex. 2**, Sablich Decl. ¶ 11. |
| 58.    CBD is an oil derived from the plant *Cannabis sativa L.* | **Ex. 2,** Sablich Decl. ¶ 11. |
| 59.    Thus, the Card Brand Rules prohibit, among other things, boarding merchants that sell CBD and kratom, as those products are or were, at all relevant times, illegal. As early as the beginning of 2017, Plaintiff sent notices to its merchants that the sale of kratom and CBD violated the Card Brand Rules. | **Ex. 2**, Sablich Decl. ¶ 6; **Ex. 6**, Cha Dep. 55:4-59:18; **Ex. 5**, Malone Decl. Ex. 5-96. |
| 60.    The Card Brand Rules | **Ex. 2**, Sablich Decl. ¶ 6, Exs. A-1, A-2, |

16

| | |
|---|---|
| also prohibit boarding merchants engaged in any form of fraudulent conduct, including but not limited to "factoring" (also known as "laundering" or "aggregating"). | A-3, A-4, A-5, A-6, A-9, A-10. |
| 61.    Factoring is a practice commonly used by merchants who cannot qualify for a merchant account and merchants who want to conceal their true identity from the acquirer, the Card Brands, and law enforcement agencies. | **Ex. 2**, Sablich Decl. ¶ 13. |
| 62.    Factoring occurs when a merchant uses its merchant account to process transactions for another entity. | **Ex. 2**, Sablich Decl. ¶ 13. |
| 63.    Factoring also occurs when a merchant creates a shell company, which applies for a merchant account but acts only as a front.  Once the merchant account is approved, the fraudulent merchant then launders its own transactions through the shell company's merchant account. | **Ex. 2**, Sablich Decl. ¶ 13. |
| 64.    Factoring is illegal and constitutes fraudulent conduct under the Agreement and the Card Brand Rules;  engaging in such conduct | **Ex. 2**, Sablich Decl. ¶ 13. |

17

| | |
|---|---|
| qualifies as an automatic violation of the Card Brand Rules. | |
| 65. The Card Brand Rules also prohibit as fraudulent activity submitting merchant applications that contain false or misleading information, such as listing an incorrect MCC or SIC code or listing inaccurate product descriptions. | **Ex. 2**, Sablich Decl. ¶ 17. |
| 66. The Card Brands use four-digit merchant category codes ("MCC") to classify merchants by the good or services they sell. MCCs are sometimes (incorrectly) referred to as "standard industrial classifications" ("SIC"). SICs are for governmental use, and the codes and descriptions are different. | **Ex. 2**, Sablich Decl. ¶ 17. |
| 67. ISOs who intentionally use incorrect or inaccurate MCCs when submitting merchant applications violate the Card Brand Rules. | **Ex. 2**, Sablich Decl. ¶ 17. |
| *4.   Defendants' Right to Terminate* | |
| 68. Pursuant to the Agreement, "Service Providers shall have the right to immediately terminate this Agreement by written notice upon | **Ex. 2**, Sablich Decl. Ex. S at §18(b)(ii). |

18

| | |
|---|---|
| the occurrence of" any "[r]epeated breach of any Rule by ISO, or breach of any Material Rule by ISO . . . ." | |
| 69. Pursuant to the Agreement, "Service Providers shall have the right to immediately terminate this Agreement by written notice upon the occurrence of" any "[f]raudulent activity by ISO . . . ." | **Ex. 2**, Sablich Decl. Ex. S at § 18(b)(iii). |
| 70. Pursuant to the Agreement, "Service Providers' obligation to make residual payments to ISO under Section 9 will continue after the effective date of nonrenewal or termination of this Agreement . . . provided, however, that Service Providers' obligation to make residual payments to ISO under Section 9 will cease upon the effective date of termination if Service Providers terminate this Agreement pursuant to Section 18(b)(i), 18(b)(ii), or 18(b)(iii)." | **Ex. 2**, Sablich Decl. Ex. S at § 18(d)(iii). |

*5.* *Choice of Law and Attorneys' Fees*

| | |
|---|---|
| 71. The Agreement is "governed by and construed in accordance with the laws of the State | **Ex. 2**, Sablich Decl. Ex. S at §§ 33, 34. |

19

| | |
|---|---|
| of New York without giving effect to its conflict of law principles." Moreover, the prevailing party in any litigation regarding the Agreement is "entitled to recover its reasonable attorneys' fees and costs . . . ." | |

### C. Plaintiff's Breaches of the Card Brand Rules and Agreement

*1.    The G2 and Visa Detections.*

| | |
|---|---|
| 72.    Prior to termination of the Agreement, FDMS engaged G2 to monitor merchant accounts and identify merchants engaged in activity that was illegal and/or brand-damaging or otherwise against the Card Brand Rules. FDMS provided G2 with a list of all merchants processing with FDMS, whether in Plaintiff's Portfolio or not, along with the website URL from each of the merchants' applications. If the merchant did not provide a URL, G2 would try to find one for screening purposes. | **Ex. 8**, Excerpt of Transcript of Deposition Testimony of Louis Sablich, dated November 7, 2018 ("Sablich Dep."), at 23:23-27:23; **Ex. 2**, Sablich Decl. ¶ 18. |
| 73.    G2 also maintained a list of URLs known to sell illegal or brand-damaging products. G2 performed ongoing screening of each URL and | **Ex. 8**, Sablich Dep. at 31:8-32:3; **Ex. 2**, Sablich Decl. ¶ 18. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| conducted test transactions to identify content sold through the websites that was illegal or brand-damaging. As part of this process, G2 would attempt to purchase illegal or brand-damaging products from a website (with full knowledge that the card issuer would decline the transaction) and then trace the transaction by comparing the transaction information with FDMS's files. When G2 found merchants processing with FDMS engaged in fraudulent or illegal activity, G2 would notify FDMS via an online portal. | |
| 74. Beginning in January 2017, FDMS started to receive notifications from G2 that Plaintiff's merchants were engaged in prohibited activity. | **Ex. 8**, Sablich Dep. at 22:19-7, 23:15-18; **Ex. 2**, Sablich Decl. ¶ 20. |
| 75. From January through November 2017, G2 identified 16 merchant accounts Plaintiff had boarded engaged in fraudulent, illegal, and/or brand-damaging, and/or fraudulent activity. | **Ex. 8**, Sablich Dep. at 23:11-18; **Ex. 2**, Sablich Decl. ¶¶ 19-20, Exs. O, P. |
| 76. Of those 16 accounts, most were selling kratom and some | **Ex. 8**, Sablich Dep. at 29:25-30:6; **Ex. 2**, Sablich Decl. ¶ 20, Exs. O, P. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO. 2:18-CV-1463

68811499.15

| | |
|---|---|
| were selling CBD and one was selling San Pedro cactus seeds. | |
| 77. Most of the merchants utilized websites for these transactions that were different than the websites disclosed to Defendants but would submit the transactions from those websites through their FDMS merchant account | **Ex. 8**, Sablich Dep. at 91:4-21; **Ex. 2**, Sablich Decl. Exs. O, P. |
| 78. The merchant ESPY Distro, LLC disclosed the website www.espydistro.com to Defendants, but G2 completed a test transaction where this merchant account was used to sell kratom through the website http://www.jacksonkratom.com. | **Ex. 2**, Sablich Decl. Exs. O, P. |
| 79. Moreover, none of the merchants disclosed these products on their merchant application, and none were authorized to process the sale of them. | **Ex. 5**, Malone Decl. Ex. 5-1, 5-2, 5-3, 5-4, 5-5, 5-6, 5-10, 5-11, 5-14, 5-85, 5-88, 5-90, 5-92, 5-93; **Ex. 2**, Sablich Decl. ¶ 21, Ex. Q; **Ex. 9**, Excerpts of Declaration of Timothy E. Haywood ("Haywood Decl.") Ex. 6. |
| 80. Accordingly, these merchants were either directly (and fraudulently) selling illegal and/or brand-damaging products or factoring. | **Ex. 8**, Sablich Dep. at 64:6-23 (factoring), 22:19-23:7 (illegal and/or brand-damaging). |
| 81. G2 eventually identified | **Ex. 8**, Sablich Dep. at 22:19-23:7; **Ex.** |

22

| | |
|---|---|
| 11 more accounts, for a total of 27, that were engaged in similar activity. | **2**, Sablich Decl. ¶ 19. |
| 82.    Additionally, on or about October 30, 2017, Visa notified FDMS of a Green Payment merchant engaged in activity law enforcement found was illegal and/or brand damaging. | **Ex. 8**, Sablich Dep. at  22:19-23:7; **Ex. 2**, Sablich Decl. ¶ 22, Ex. J. |

2.    *FDMS confirmed accounts of merchants Plaintiff boarded were being used to sell illegal and/or brand-damaging products.*

| | |
|---|---|
| 83.    FDMS confirmed G2's findings and determined Plaintiff boarded numerous merchants whose accounts were being used to sell kratom and CBD through undisclosed websites, which was illegal and/or brand-damaging activity and therefore prohibited by the Card Brand Rules. | **Ex. 8**, Sablich Dep. at 32:3-33:17, 120:2-121:7; **Ex. 2**, Sablich Decl. ¶ 21. |
| 84.    Merchant Timothy Haywood was referred to Plaintiff when he was looking for a solution to process kratom sales. Jesse Cretaro told Mr. Haywood he could get him "approved for processing for kratom sales" and that "Green Payment had merchants that sell kratom." | **Ex. 10**, Excerpt from Deposition of Timothy Haywood ("Haywood Dep."), dated February 22, 2019 at 11:12-18; **Ex. 9**, Declaration of Timothy Haywood ("Haywood Decl.") Decl. ¶ 7. |

23

68811499.15

| | |
|---|---|
| 85.    Green Payment merchant Nate Weinberg routinely referred other merchants that sold CBD and similar products to Plaintiff. | **Ex. 11**, Excerpt of Transcript of Rule 30(b)(6) Deposition of Infusionz, LLC ("Infusionz Dep."), dated February 21 2019, at 71:13-73:24. |
| 86.    In addition to regularly receiving referrals from other merchants, Plaintiff actively solicited multiple unqualified merchants. | **Ex. 5**, Malone Decl. Ex. 5-9; **Ex. 3**, Conrad Dep. at 44:1-9; **Ex. 2**, Sablich Decl. Ex. Q; **Ex. 11**, Infusionz Dep. 11:12-18; 71:15-73:25. |
| 87.    The Green Payment sales agent associated with most of the merchants G2 identified was Jesse Cretaro. | **Ex. 2,** Sablich Decl. Ex. Q; **Ex. 8**, Sablich Dep. at 91:4-21. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| 88.     At   all   relevant   times, Plaintiff was aware of and responsible for Cretaro's conduct. | **Ex. 5**, Malone Decl. Exs. 5-7, 5-8; **Ex. 2,** Sablich Decl. Ex. S § 16(a); **Ex. 3**, Conrad Dep. at 106:19-107:24, 110:13-16; **Ex. 4**, Lee Dep. at 124:3-6; 158:21-159:2. |
| 89.     Plaintiff's     principal, Richard Cha, and other Green Payment employees     were     well     aware     of Cretaro's improper conduct. | **Ex. 3**, Conrad Dep.66:10-25, 106:19-107:24,110:13-16; **Ex. 4**, Lee Dep.124:3-6, 158:21-159:2. |

*3.    FDMS confirmed Plaintiff boarded numerous merchants that were engaged in fraudulent conduct.*

| | |
|---|---|
| 90.     After receiving the G2 and Visa   detections,   FDMS   confirmed Plaintiff boarded numerous merchants engaged in fraudulent conduct, either by selling illegal products not disclosed on   their   merchant   applications   or factoring. | **Ex. 8,** Sablich Dep. at 64:6-23 (factoring), 22:19-23:7 (illegal and/or brand-damaging); **Ex. 2**, Sablich Decl. ¶ 21; **Ex. 8**, Sablich Dep. at 32:3-17. |
| 91.     FDMS   reviewed   the   G2 notifications and test transactions and confirmed   that   at   least   11   merchants were   using   a   different,   undisclosed | **Ex. 8**, Sablich Dep. at 149:19- 150:7; **Ex. 2**, Sablich Decl. Ex. O, P. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | | |
|---|---|---|
| URL for the transactions. | | |
| 92.   FDMS   also   confirmed Plaintiff's   merchants'   accounts   were being   used   to   sell   kratom   and   CBD, which   were   not   disclosed   on   their merchant applications. | **Ex. 8**, Sablich Dep. at 33:7-34:4; **Ex. 2**, Sablich Decl. ¶ 21, Exs. O, P, Q; **Ex. 5**, Malone Decl. Exs. 5-1, 5-2, 5-3, 5-4, 5-5, 5-6, 5-10, 5-11, 5-14, 5-85, 5-88, 5-90, 5-93, 5-94; **Ex. 9**, Haywood Decl. Ex. 6. |
| *4.   Plaintiff instructed merchants to provide false or misleading information.* | | |
| 93.   Not   only   did   Plaintiff solicit and board merchants engaged in illegal,   brand-damaging,   and/or fraudulent   activity,   Plaintiff   instructed many of these merchants how to avoid detection by Defendants. | **Ex. 10**, Haywood Dep. at 12:14-25, 13:16-16:8; **Ex. 9**, Haywood Decl. ¶ 11, 15, 16; **Ex. 11**, Infusionz Dep.87:25-88:11, 92:6-23, 95:4-16, 105:19-106:16; **Ex. 5**, Malone Decl. Exs. 5-12, 5-13, 5-86, 5-87, 5-98, 5-91, 5-95. |
| 94.   When   discussing   a merchant   application,   Green   Payment employee   Ana   Ferrer-Jenkins   told Cretaro   to   instruct   the   merchant   to "take down merch or ads that advertise weed   or   vaping   to   prevent   red flagging." | **Ex. 5**, Malone Decl. Ex. 5-91. |
| 95.   Cretaro   told   a   merchant not to list a phone number used on the merchant's   actual   website   so | **Ex. 5**, Malone Decl. Ex. 5-89. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| information submitted to FDMS did not match. | |
| 96.   Cretaro instructed multiple merchants to create fake marketing material that avoided advertising CBD and kratom sales. | **Ex. 5**, Malone Decl. Exs. 5-13, 5-87. |
| 97.   Cretaro told a merchant to use the merchant's wife's name on his application.   Cretaro also discussed with another merchant using that merchant's wife's name because the merchant's name was "inextricably linked to Kratom." | **Ex. 10**, Haywood Dep.37:9-38:10; **Ex. 9**, Haywood Decl. ¶ 15; **Ex. 5**, Malone Decl. Exs. 5-12. |
| 98.   Cretaro instructed a merchant to provide a different phone number as the one listed on the merchant application was affiliated with kratom. | **Ex. 5**, Malone Decl. Exs. 5-86. |
| 99.   Cretaro advised Timothy Haywood to alter checks, alter bank documents, change his address on documents, create fake marketing materials, and use a different business name on his merchant applications. | **Ex. 10**, Haywood Dep.13:16-15:3; **Ex. 9**, Haywood Decl. ¶¶ 8, 11, 15. |
| 100.   Even after his account and back-up accounts had all been terminated Cretaro instructed Haywood | **Ex. 9**, Haywood Decl. ¶ 15. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

| | |
|---|---|
| how to set up a new merchant account with FDMS and attempt to avoid detection. In particular, Cretaro instructed Haywood to have Haywood's wife fill out the merchant application in her name to prevent FDMS from rejecting the application due to Haywood's prior termination and sale of kratom. Cretaro also instructed him to submit the application as a website for selling clothing, but the real purpose was to use the merchant account for kratom sales. | |
| 101. Cretaro told Nate Weinberg, principal of multiple Green Payment merchants, to use a different LLC that was not linked to CBD and to lie about what the LLC was selling after one of Weinberg's businesses was terminated by another processor because the application would not be approved for processing if it was linked to CBD. | **Ex. 11**, Infusionz Dep.87:25-88:11, 92:6-23, 95:2-16, 105:19-107:5. |

5.   *Plaintiff knowingly submitted merchant applications containing false or misleading information to Defendants.*

| | |
|---|---|
| 102. Plaintiff submitted multiple merchant applications to | **Ex. 3**, Conrad Dep. at 111:10-20. |

28

| | |
|---|---|
| FDMS that were "manipulated" to "disguise the business entity." | |
| 103. Plaintiff submitted multiple merchant applications to FDMS that did not contain complete, truthful information. | **Ex. 3**, Conrad Dep. at 111:10-20; 138:15-24; **Ex. 5**, Malone Decl. Ex. 5-1, 5-2 , 5-3, 5-4, 5-5, 5-6, 5-10, 5-11, 5-14, 5-85, 5-88,  5-90, 5-92, 5-93;  **Ex. 2**, Sablich Decl. Ex. Q; **Ex. 9**, Haywood Decl. Ex. 2. |
| 104. Plaintiff coded CBD and Kratom merchants as "miscellaneous and specialty retail stores" or "miscellaneous food stores." | **Ex 3**. Conrad Dep. 77:8-9 (stating that code 5499 is for "[m]iscellaneous food stores, convenience stores, and specialty markets."), 80:18-81-17; **Ex. 5,** Malone Decl. Exs. 5-1, 5-2, 5-3, 5-4, 5-5, 5-10, 5-85, 5-88;  **Ex. 2**, Sablich Decl. Ex. Q. |

6.     *Prior to termination, multiple employees notified Richard Cha of Plaintiff's submitting false information to Defendants.*

| | |
|---|---|
| 105. Well before the Agreement was terminated, Green Payment employees James Conrad and Ted Lee were concerned about Plaintiff's submitting false information to Defendants. | **Ex. 3**, Conrad Dep. at 106:14-107:24; **Ex. 4**, Lee Dep. at 156:15-157:6, 124:3-6; 158:21-159:2. |
| 106. Conrad was uncomfortable specifically because merchant applications were being "manipulated." | **Ex 3**, Conrad Dep. at 106:19-107:24 |
| 107. Conrad discussed his | **Ex. 6**, Cha. Dep. at 24:12-16; **Ex. 3**, |

29

| | |
|---|---|
| concerns directly with Plaintiff's CEO, Richard Cha. | Conrad Dep. at 110:13-16. |
| 108. Plaintiff did nothing to address Conrad's concerns. | **Ex. 3**, Conrad Dep.112:19-24; **Ex. 6**, Cha Dep. at 184:13-23, 188:15-21, 192:8-10, 195:20-196:1, 215:24-216:4, 216:10-217:10, 217:21-218:11. |
| 109. Moreover, Plaintiff had no procedure in place to trigger an investigation based on merchant terminations. | **Ex. 3**, Conrad Dep. at 112:19-24; **Ex. 4**, Lee Dep. at 152:25-5. |
| 7.     *FDMS notified Plaintiff of the G2 detections months before termination.* | |
| 110. For months before the Agreement was terminated, upon deciding to close a merchant account based on FDMS's confirmation of a G2 detection, FDMS notified Plaintiff of the closure of each unqualified or illegal merchant account and the reason for it. | **Ex. 5**, Malone Decl. Exs. 5-15–5-84; **Ex 7**, Farkas Dep. at 156:4-20; **Ex. 8**, Sablich Dep. at 29:25 -30:6, 57:9-19; **Ex. 2**, Sablich Decl. ¶ 24. |
| 111. Despite receiving these repeated notifications, Plaintiff did absolutely nothing to investigate who was involved in the boarding of these merchants or whether there were additional merchants in its Portfolio engaged in similar illegal and/or brand- | **Ex. 6**, Cha Dep. at 184:13-23, 188:15-21, 192:8-10, 195:20-196:1, 215:24-216:4, 216:10-217:10, 217:21-218:11. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| damaging businesses and in fact *continued* to board such merchants. | |

**D.   Defendants terminated the Agreement.**

| | |
|---|---|
| 112.   From January to November 2017, Plaintiff submitted approximately 100 merchant applications, and, as of November 14, 2017, had approximately 500 merchants in its Portfolio. | **Ex. 8**, Sablich Dep. 51:3–7; 67:1–8; **Ex. 2**, Sablich Decl. at ¶ 23. |
| 113.   Thus, the 16 G2 detections represented 16% of the merchant accounts boarded from January to November 2017 and 3.2% of Plaintiff's total Portfolio. | **Ex. 8**, Sablich Dep. 51:3–7; 67:1–8. |
| 114.   FDMS viewed this as an alarmingly high number of merchants engaged in illegal, brand-damaging, and/or fraudulent activity, particularly given the short timeframe and small size of Plaintiff's Portfolio. | **Ex. 8**, Sablich Dep. 51:3–7; 67:1–8; **Ex. 2**, Sablich Decl. at ¶ 23. |
| 115.   Accordingly, on November 14, 2017, FDMS decided to terminate Plaintiff due to Plaintiff's boarding of the accounts identified by G2, and confirmed by FDMS, as engaging in factoring and/or the sale of illegal and unqualified products. | **Ex. 8**, Sablich Dep. at 22:14-23:14; 29:25-30:12; **Ex. 2**, Sablich Decl. ¶¶ 26-27, Exs. O, P;  **Ex. 12**, Excerpts of Transcript from Deposition of John Henaghan ("Henaghan Dep."), dated February 2, 2019 at 23:21-24:6. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| 116.  The Card Brands may fine FDMS when its merchants violate the Card Brand Rules. | **Ex. 2**, Sablich Decl. ¶ 15. |
| 117.  Accordingly, on November 14, 2017, after confirming that the merchant accounts G2 identified that were boarded by Plaintiff had in fact engaged in the sale of illegal and/or brand-damaging products and/or factoring, FDMS decided to terminate the Agreement because of repeated violations of the Card Brand Rules and fraudulent activity. | **Ex. 8**, Sablich Dep. 18:8-17; 22:1-7. |
| 118.  On November 29, 2017, FDMS sent the formal notice of termination to Plaintiff citing sections 18(b)(ii), (b)(iii) and (b)(ix) of the Agreement as the bases for the termination. | **Ex. 8**, Sablich Dep. 136:10-12 (stating termination letter was dated November 29); **Ex. 2**, Sablich Decl. ¶ 27, Ex. R. |
| 119.  The termination letter was over-inclusive and stated that Plaintiff had "boarded *approximately* 57 high risk merchant accounts . . . ." | **Ex. 2**, Sablich Decl. ¶ 27, Ex. R. |
| 120.  Defendants actually terminated Plaintiff due to the 17 verified G2 and Visa notifications | **Ex. 8**, Sablich Dep. at 22:14-23:14; 29:25-30:12; **Ex. 2**, Sablich Decl. ¶ 26; **Ex. 12**, Henaghan Dep. at 23:21-24:6. |

32

| | | |
|---|---|---|
| 1<br>2 | under the very provisions of the Agreement cited in the letter. | |
| 3<br>4 | 121.  The examples of accounts provided in the letter were not correct. | **Ex. 2**, Sablich Decl. ¶ 27. |
| 5<br>6<br>7<br>8<br>9 | 122.  At least one merchant opened a merchant account through a shell business that purported to sell clothing, but actually used the merchant account to sell kratom. | **Ex. 9**, Haywood Decl. ¶¶ 15-16. |
| 10<br>11<br>12<br>13<br>14<br>15<br>16<br>17 | 123.  Plaintiff alleges Defendants interfered with Plaintiff's "contractual relationships" with boarded merchants, which ultimately "prevent[ed] [Plaintiff] from referring these merchants to alternate processors who would compensate [Plaintiff] . . . ." | **Ex. 1**, Compl. ¶ 43. |
| 18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 124.  The Agreement provides: "ISO shall only use the then-current form of Merchant Application and Merchant Agreement that has been designated and approved by Service Providers. There may not be any separate or other agreement between ISO and any Merchant in any way relating to the Merchant's participation of the Program." | **Ex. 2**, Sablich Decl. Ex. S at § 7(a). |

28

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| 125.   The Agreement provides: "[I]f Service Providers terminate this Agreement pursuant to Section 18(b)(i), 18(b)(ii), 18(b)(iii) or 18(b)(v), then ISO's obligation to comply with the Nonsolicitation Obligation will continue for thirty-six (36) months after the effective date of nonrenewal or termination of this Agreement. | **Ex. 2**, Sablich Decl. Ex. S at § 18(d)(iv). |
| 126.  Plaintiff actively and successfully boarded merchants with other processors after Defendants terminated the Agreement. | **Ex. 13**, Certificate of Authenticity of Business Records for National Merchants Association; **Ex. 14**, National Merchants Association's Merchant Applications; **Ex. 15**, Certificate of Authenticity of Business Records for TSYS; **Ex. 16**, Summary of Merchants Boarded to TSYS by Plaintiff**; Ex. 17** Plaintiff's Responses to Defendants' Interrogatories at Response 7. |
| 127.  Plaintiff alleges Defendants "fabricated" Plaintiff's violations of the Agreement as a "pretext" for termination "in response to Green Payment's attempt to negotiate better rates with Defendants and in anticipation of Green Payment's | **Ex. 1**, Compl. ¶ 23 |

34

| | |
|---|---|
| likely non-renewal of the Marketing Agreement." | |
| 128.   But, according to Plaintiff, the discussion about rates and termination occurred "on or about November 1, 2017." | **Ex. 1**, Compl. ¶ 17. |
| 129.   And, on October 11, 2017 FDMS noticed there was a "possible issue" with Plaintiff's portfolio. | **Ex. 8**, Sablich Dep. at 119:22-121:7. |
| 130.   Plaintiff fails to allege it had a confidential or fiduciary relationship with Defendants. | *See, generally* **Ex. 1**, Compl. |
| 131.   Plaintiff seeks declaratory relief regarding the parties' "respective rights and obligations under the Marketing Agreement, specifically whether Defendants wrongfully terminated the Marketing Agreement for cause, and whether Green Payment is entitled to residuals . . . ." | **Ex. 1**, Compl. ¶ 57. |
| 132.   The Program Standards also contain certain requirements with respect to Plaintiff's business operations and boarding of merchants, many of which Plaintiff failed to comply with. | *See infra* ¶¶ 133 - 157. |
| 133.   The Program Standards | **Ex. 2**, Sablich Decl. Exs. B at 2, D at 2, |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

| | |
|---|---|
| required Plaintiff to document its policies, procedures and processes for solicitation of merchants for Defendants' Program addressing and consistent with Plaintiff's obligations as described in the Agreement, Credit Policy, and Program Standards. | F at 2. |
| 134.   Plaintiff did not document its policies, procedures and processes for solicitation of merchants for Defendants' Program. | **Ex. 6**, Cha Dep. at 44:12 – 47:13; **Ex. 3**, Conrad Dep. at 63:7 – 64:17; **Ex. 4**, Lee Dep. at 83:6-85:11. |
| 135.   The Program Standards required Plaintiff to ensure its obligations with respect to the Program were performed without the use of any misleading or deceptive business practices. | **Ex. 2**, Sablich Decl. Ex. B at 2; 2013 at 9; 2015 at 10. |
| 136.   Plaintiff utilized deceptive and/or misleading business practices in boarding merchants. | **Ex. 3**, Conrad Dep. at 91:9-10,111:10-20, 138:15-24; **Ex. 9**, Haywood Decl. ¶¶ 11, 12, 15; **Ex. 4**, Lee Dep. at 96:1-16, 153:7-154:14, 156:15-157:6; **Ex. 5**, Malone Decl. Exs. 5-86, 5-87, 5-88, 5-89, 5-91, 5-12, 5-13. |
| 137.   The Program Standards required Plaintiff to have an agent and employee training program addressing each of such agent's or employee's | **Ex. 2**, Sablich Decl. Ex. B at 2. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | | |
|---|---|---|
| responsibilities in connection with the Program and components of the Program, including Merchant Applications, Merchant Agreements and related requirements, applicable Rules, these Program Standards, FDMS Credit Policy, and any other relevant topics (e.g., terminal training). | |
| 138. Plaintiff did not provide all of its employees and agents training addressing each of agent's or employee's responsibilities in connection with the Program and components of the Program, including applicable Rules, the Program Standards, or FDMS's Credit Policy. | **Ex. 3**, Conrad Dep. at 28:3-5, 28:23-25, 29:8-10, 29:23 – 30:1; **Ex. 4**, Lee Dep. at 25:21 – 27:8. |
| 139. Under the Program Standards, in the event it became aware of "any actual or alleged fraudulent activities or misrepresentations by its employees or agents in connection with the Program," Plaintiff was required to promptly advise FDMS, investigate such occurrences and take appropriate action to stop any such activities or misrepresentations." | **Ex. 2**, Sablich Decl. Ex. B at 2. |
| 140. Plaintiff became aware of | **Ex. 3**, Conrad Dep. at 110:13-16. |

37

| | |
|---|---|
| actual and/or alleged fraudulent conduct by its agent, Jesse Cretaro. | |
| 141. Plaintiff failed to advise FDMS of this and failed to investigate or take any action to stop the fraudulent activities and misrepresentations. | **Ex. 3**, Conrad Dep. at 65:2-10; **Ex. 6**, Cha Dep. at 186:5-8, 195:7 – 196:1. |
| 142. The Program Standards required Plaintiff to solicit only qualified and acceptable merchants. | **Ex. 2**, Sablich Decl. Ex. B at 3, Ex. D at 2; Ex. F at 2. |
| 143. Plaintiff solicited unqualified and unacceptable merchants. | **Ex. 2**, Sablich Decl. Exs. O, P, Q; **Ex. 9**, Haywood Decl. |
| 144. The Program Standards required Plaintiff to ensure each prospective merchant fully and accurately completed the MPAA. | **Ex. 2**, Sablich Decl. Ex. D at 3, Ex. F at 3. |
| 145. Plaintiff did not require all of its merchants to complete the MPAA. In some cases, Plaintiff completed the MPAA. | **Ex. 3**, Conrad Dep. at 69:23 – 71:25; **Ex. 4**, Lee Dep. at 69:10 – 70:13; **Ex. 11**, Infusionz Dep. at 59:3 – 60:2. |
| 146. Plaintiff did not ensure the MPAAs it submitted were completed fully and accurately. | **Ex. 3**, Conrad Dep. at 111:10-20, 138:15-24; **Ex. 5**, Malone Decl. Exs. 5-1, 5-2, 5-3, 5-4, 5-5, 5-6, 5-10, 5-11, 5-14, 5-85, 5-88, 5-90, 5-92, 5-93; **Ex. 2**, Sablich Decl. Ex. Q; **Ex. 9**, Haywood Decl. Ex. 2. |
| 147. The Program Standards | **Ex. 2**, Sablich Decl. Ex. D at 4, Ex. F at |

38

| | |
|---|---|
| required Plaintiff to verify that each prospective merchant conducted or intended to conduct a bona fide, lawful business operation, including inspecting the prospective merchant's premises to determine whether a prospective merchant has the proper facilities, equipment, inventory and license to conduct the business, or reviewing the merchant's website, as applicable. | 4. |
| 148. Plaintiff failed to verify each prospective merchant conducted bona fide, lawful businesses. | **Ex. 3**, Conrad Dep. at 111:10-20, 138:15-24; **Ex. 5**, Malone Decl. Ex. 5-1, 5-2, 5-3, 5-5, 5-6, 5-10, 5-11, 5-14, 5-85, 5-88, 5-90, 5-92, 5-93; **Ex. 2**, Sablich Decl. Ex. Q; **Ex. 9**, Haywood Decl. Ex. 2. |
| 149. Plaintiff failed to inspect merchants' premises. | **Ex. 11**, Infusionz Dep. at 60:3-6. |
| 150. Plaintiff was required to verify the product its merchants sold were consistent with the products listed on the merchant application. | **Ex. 2**, Sablich Decl. Ex. B at 5, Ex. D at 4, Ex. F at 5. |
| 151. Plaintiff failed to verify the products its merchants sold were consistent with the products listed on the merchant application. | **Ex. 2**, Sablich Decl. Exs. O, P, Q; **Ex. 9**, Haywood Decl. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

| | |
|---|---|
| 152. The Program Standards provide the potential liability related to fraudulent merchant activity remains with Client as a result of inaccurate, incomplete or missing merchant paperwork. | **Ex. 2**, Sablich Decl. Ex. B at 6. |
| 153. The Program Standards provide applications from unqualified/unacceptable businesses, as identified in the FDMS Credit Policy, should not be solicited and must not be signed. | **Ex. 2**, Sablich Decl. Ex. B at 8. |
| 154. Plaintiff solicited unqualified/unacceptable businesses. | **Ex. 2**, Sablich Decl. Exs. O, P, Q; **Ex. 9**, Haywood Decl. |
| 155. Plaintiff signed unqualified/unacceptable businesses. | **Ex. 2**, Sablich Decl. Exs. O, P, Q; **Ex. 9**, Haywood Decl. |
| 156. The Program Standards required Plaintiff to establish policies and procedures to verify all merchant paperwork prior to submitting paperwork to FDMS. | **Ex. 2**, Sablich Decl. Ex. B at 7, Ex. D at 6, Ex. F at 7. |

## I.  CONCLUSIONS OF LAW

1.     Defendants are entitled to Summary Judgment on Count I (Breach of Contract) because Green Payment breached the Marketing Agreement by repeatedly violating the Card Brand Rules and/or engaging in fraudulent activity.

40

2.     Plaintiff repeatedly violated the Card Brand Rules by boarding merchants (1) selling illegal and/or brand damaging products and/or (2) engaging in fraudulent activity.

3.     At all times relevant to this litigation, CBD was a Schedule I controlled substance under federal law.

4.     At all times relevant to this litigation, the commercial sale of CBD violated the Card Brand Rules as illegal activity.

5.     At all times relevant to this litigation, kratom was illegal under the law of several states and cities.

6.     At all times relevant to this litigation, the sale of kratom violated the Card Brand Rules as illegal and/or brand-damaging activity.

7.     Each time Plaintiff boarded one of the 17 merchants that sold these products, Plaintiff violated the Card Brand Rules prohibiting the sale of illegal and/or brand-damaging products.

8.     Plaintiff further boarded merchants engaged in fraudulent activity as all 17 merchants selling kratom or CBD did not disclose these products on their merchant applications.

9.     Plaintiff also violated the Card Brand Rules by boarding merchants engaged in the practice of factoring. In addition to being inherently fraudulent, factoring is expressly illegal in several states where Plaintiff boarded merchants, including Florida, Idaho, North Carolina, Oregon, Virginia, and Washington.

10.    Plaintiff also engaged in fraudulent activity in violation of the Agreement by conspiring with merchants to deceive and mislead Defendants.

11.    Defendants properly terminated the Marketing Agreement pursuant to sections 18(b)(ii).

12.     Defendants properly terminated the Marketing Agreement pursuant to sections 18(b)(iii).

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

13.   Defendants had the right to terminate Plaintiff's Residuals pursuant to section 18(d)(iii) of the Agreement.

14.   Plaintiff's claim for breach of contract also fails because it cannot show it performed its obligations under the Agreement, which is an essential element of its claim.

      a.   The Agreement obligated Plaintiff to enter into written agreements with its independent contractors requiring the independent contractors to comply with all applicable terms of the Agreement. Plaintiff failed to perform this obligation. For a substantial period of time, Plaintiff utilized the services of independent contractor Jesse Cretaro without a written agreement; when Plaintiff and Mr. Cretaro entered into such an agreement, it did not comply with the requirements of the Agreement.

      b.   The Agreement also obligated Plaintiff to verify its merchants were conducting legal, bona fide businesses and warranted that the information sent to Service Providers was, to the best of Plaintiff's knowledge, correct, complete, and not misleading. Plaintiff, however, knew merchants sold prohibited products yet continued to board these merchants in violation of the Agreement.

      c.   Plaintiff additionally failed to comply with the Program Standards as required by the Agreement.

15.   Defendants are entitled to Summary Judgment on Count II (Conversion) because: (1) Plaintiff's claim is improperly predicated on a breach of contract; and (2) Plaintiff has no legal right to the Residuals because Defendants properly terminated Plaintiff's Residuals pursuant to section 18(d)(iii) of the

42

Agreement when it terminated the Agreement pursuant to sections 18(b)(ii) and (b)(iii) thereof.

16.     Defendants are entitled to Summary Judgment on Count III (Intentional Interference with Prospective Economic Relations) because: (1) Plaintiff did not have a contractual relationship with boarded merchants, and any such contractual relationship is prohibited by the Agreement; (2) the harm Plaintiff alleges (that it was prevented from boarding merchants with other processors) was permitted under the Agreement and did not actually occur; and (3) Plaintiff does not allege, and cannot establish, Defendants' conduct was motivated solely by malice.

17.     Defendants are entitled to Summary Judgment on Count IV (Unfair Competition under the California Business Code) because: (1) this claim is improperly based on an alleged breach of contract; and (2) Plaintiff had no legal interest in the post-termination Residuals under the Agreement.

18.     Defendants are entitled to Summary Judgment on Count V (Accounting) because: (1) the Parties did not have a fiduciary relationship; (2) Plaintiff has an adequate remedy at law; and (3) Plaintiff never made a demand for an accounting.

19.     Defendants are entitled to Summary Judgment on Count VI (Declaratory Relief) because it is duplicative of Plaintiff's breach-of-contract claim.

20.     Pursuant to section 34 of the Agreement, Defendants are entitled to recover from Plaintiff their reasonable attorneys' fees and costs incurred in this litigation.

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15

Dated:  July 22, 2019                    POLSINELLI LLP


                                   By:  /s/ John W. Peterson
                                         John W. Peterson (SBN: 179343)

                                         *Attorneys for Defendants First Data*
                                         *Merchant Services LLC and Wells Fargo*
                                         *Bank, N.A.*

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463
68811499.15

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 22, 2019, a copy of the foregoing document was served via the Court's Electronic Filing System pursuant to Local Rule 5-3.2.1 and via U.S. Mail as follows:

Eugene Rome
erome@romeandassociates.com
Sridavi Ganesan
sganesan@romeandassociates.com
Rome & Associates, A.P.C.
2029 Century Park East, Suite 450
Los Angeles, California 90067

/s/ John W. Peterson
John W. Peterson

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  2:18-CV-1463

68811499.15