POLSINELLI LLP
JOHN W. PETERSON (SBN: 179343)
john.peterson@polsinelli.com
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573

Attorneys for Defendants FIRST DATA MERCHANT SERVICES LLC and WELLS FARGO BANK, N.A.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREEN PAYMENT SOLUTIONS, LLC,<br><br>      Plaintiff,<br><br> v.<br><br>FIRST DATA MERCHANT SERVICES CORPORATION; WELLS FARGO BANK, N.A.; and DOES 1 to 100,<br><br>      Defendants.<br>FIRST DATA MERCHANT SERVICES LLC and WELLS FARGO BANK, N.A.,<br><br>      Counter-Plaintiffs,<br><br> v.<br><br>GREEN PAYMENT SOLUTIONS, LLC<br><br>      Counter-Defendant. | Case No. 2:18-cv-1463 DSF (ASx)<br><br>**DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 26, 2019<br>Time: 1:30 p.m.<br>Ctrm: 7D<br>Judge: Hon. Dale S. Fischer |

  1. I, Louis Sablich, offer this Declaration in support of Defendants/Counter-Plaintiffs First Data Merchant Services LLC's ("First Data") and Wells Fargo Bank, N.A.'s ("Wells Fargo") (together, "Defendants") Motion

1

---

DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69553931.10

1  for Summary Judgment. I am over 18 years of age and am fully competent to make
2  this Declaration. I have personal knowledge of the matters set forth herein. If
3  called upon to do so, I could and would testify competently as to those matters.

4      2.     I was employed at First Data for 19 years until my retirement on July
5  15, 2018. Prior to my retirement, I was employed as Vice President, Credit Policy.
6  Prior to attaining this position, I worked in various other roles within First Data's
7  Credit Policy group. My responsibilities included, among other things, training
8  staff, creating, maintaining, and enforcing credit policies (including with respect to
9  unqualified or prohibited merchants), and handling various card-brand compliance
10 programs and data-compromise events.

11      3.     Through my experience working in the Credit Policy group, I am very
12 familiar with the structure of the payment-card industry. To accept credit and debit
13 card payments from consumers, a merchant must establish a "merchant account"
14 with a merchant acquiring bank, also referred to as an "acquirer." A merchant
15 account is a type of account that allows businesses to process consumer purchases
16 by a credit or debit card. The acquirer is the entity that has access to the credit card
17 associations (such as Visa and Mastercard), and through which merchant accounts
18 are established. Without a merchant account obtained through an acquirer,
19 merchants are unable to process consumer credit or debit card sales transactions.
20 Acquirers commonly enter into contracts with "card processors" who perform the
21 technical functions of processing payment-card transactions. Together, acquirers
22 and card processors commonly enter into contracts with independent sales
23 organizations ("ISOs") like Green Payment who solicit and sign up merchants for
24 merchant accounts with the acquirer. To my knowledge, in all cases ISOs are
25 required to provide true and accurate information on all merchant applications they
26 submit. Acquirers and card processors rely on ISOs to provide only true and
27 accurate information for the screening and underwriting of prospective merchants.
28

ISOs often use ISO "sales agents" (often independent contractors) and persons working under these sales agents (called "sub-ISOs" or "sub-agents"), who solicit and refer prospective clients to the ISO for the ISO's approval. The process of an ISO submitting a merchant application to the acquirer and card processor is commonly known as "boarding" the merchant. The merchants each ISO boards is commonly known as that ISO's merchant "portfolio."

4. Through my experience working in the Credit Policy group, I am also very familiar with the rules of the Card Brands, such as Visa and Mastercard (the "Card Brand Rules"), including how those rules are enforced and applied to acquirers, card processors, ISOs, and merchants. In fact, as the Vice President, Credit Policy, I acted as the key liaison for First Data to the Card Brands regarding rule compliance. The Card Brand Rules are generally designed to minimize the risk in the payment-card system and facilitate security. A true and correct copy of the relevant Card Brand Rules and their associated programs in place at the time of Green Payment's termination are attached hereto as collective **Exhibit A**.

5. The Card Brand Rules require all participants in their networks, including the acquirers and their registered ISOs, to comply with detailed rules governing the use of the card networks. These rules include screening and underwriting merchants to ensure that they are legitimate bona fide businesses, and to screen out merchants engaged in potentially fraudulent or illegal practices. Merchants that pose a greater risk of fraud or financial loss to the ISO, acquirer and card networks may be denied merchant accounts. For example, the ISO or acquirer may be concerned that the merchant is engaged in deceptive marketing, illegal activity or will generate excessive rates of transactions returned by consumers ("chargebacks").

6. The Card Brand Rules prohibit among other things:

      a.    illegal and/or brand-damaging activity (*e.g.*, Visa 1.5.1.4; Visa 1.10.1.3; Mastercard 1.13.2; Mastercard 3.7; Mastercard 5.11.7); and

      b.    fraudulent activity, including but not limited to factoring (defined below) (*e.g.*, Visa 1.10.1.3; Visa 10.2.2.12; Mastercard 1.13.2).

It is a violation of the Card Brand Rules for an ISO to repeatedly board merchants that violate the Card Brand Rules by engaging in illegal and/or brand-damaging activity or fraud, as the Card Brand Rules also prohibit "facilitating" such conduct. (*See, e.g.*, Mastercard Rule 1.13.2; Mastercard Rule 3.7; Visa Rule 1.10.1.3.)

7.    Visa and Mastercard have created various programs to assist all relevant parties to implement and comply with the Card Brand Rules. One of Visa's programs is its Global Brand Protection Program ("GBPP"). One of Mastercard's programs is its Business Risk Assessment and Mitigation Program ("BRAM"). If Visa or Mastercard determines a merchant, acquirer, processor, or ISO may be engaged in illegal, brand-damaging, and/or fraudulent activity that violates any of the Card Brand Rules, the offender is subject to penalties and termination pursuant to the various rules.

8.    First Data has also implemented various Program Standards and Credit Policies that First Data drafted in part to enforce the Card Brand Rules and to protect itself and the acquirers with which it contracts. True and correct copies of the Program Standards and Credit Policies in place while the Marketing Agreement was in effect are attached hereto as **Exhibits B through G**.

9.    I have received detailed information and training about both GBPP and BRAM and the Card Brand Rules they incorporate. At all relevant times, GBPP and BRAM deemed kratom[1] to be illegal and/or brand-damaging in

---

[1] Kratom is a plant indigenous to Southeast Asia that has psychoactive properties similar to certain illegal drugs. In addition to being brand-damaging under the Card

violation of the Card Brand Rules. For example, in 2017, Visa issued a Global Brand Protection Program Guide for Acquirers ("GBPP Guide"), which was intended for use by acquirers and their third-party agents, including ISOs. The GBPP Guide clarified that Visa deems kratom to be "brand-damaging" and that the sale or facilitation of the sale of kratom violates Visa's rules, including but not limited to Visa Rules 1.5.1.4 and 1.10.1.3. Importantly, the GBPP Guide was a bulletin that only *clarified* that kratom sales violate Visa's rules; kratom was, and remained, prohibited under Visa's (and Mastercard's) rules and all relevant times. A true and correct copy of the GBPP Guide is attached hereto as **Exhibit H**. By way of example, on March 25, 2016, First Data received a violation notice for a merchant account selling kratom. A true and correct copy of a March 25, 2016 Visa Illegal Transactions Violation Summary is attached hereto as **Exhibit I**. While this merchant was not boarded by Green Payment, this merchant was engaged in the same conduct as many of Green Payment's merchants identified by G2 and confirmed by First Data. The merchant account was used to sell kratom through an undisclosed website. (*See* Ex. I, p. 3.) Visa noted kratom transactions are "prohibited from being entered into the payment system" because they are illegal and/or brand-damaging in violation of its rules.

10.   FDMS received five violation notices from Visa due to merchants Plaintiff boarded selling kratom. In each instance, Visa deemed the sale of kratom to be "illegal and/or brand damaging." True and correct copies of the violation notices are attached hereto as collective **Exhibits J through N**.

---

Brand Rules as discussed herein, to my knowledge, kratom was expressly illegal in various states and cities at all relevant times and is currently illegal in Alabama (Ala. Code § 20-2-23(4)(b)(322)), Arkansas (Ark. Code Ann. § 5-64-201; Ark. Admin. Code 007.07.2), Indiana (IC 35-31.5-2-321(1)(HHH)), Wisconsin (W.S.A. § 961.14 (7)(L)(mk)), Vermont (VT ADC 12-5-23:4.0), and the District of Columbia (22-B DC ADC§ 1201(h)(16)).

11. In addition to prohibiting kratom, during all relevant times, the Card Brand Rules also prohibited CBD.[2]

12. The Card Brand Rules do not simply prohibit merchants from accepting payment-card transactions for brand-damaging or illegal products; they also prohibit the facilitation of such transactions. (*See, e.g.*, Mastercard Rule 1.13.2; Mastercard Rule 3.7; Visa Rule 1.10.1.3.) Therefore, repeatedly boarding merchants that sell brand damaging or illegal products violates the Card Brand Rules.

13. The Card Brand Rules also prohibit boarding merchants engaged in "factoring" (also known as "laundering" or "aggregating"). Factoring is a practice commonly used by merchants who cannot qualify for a merchant account and merchants who want to conceal their true identity from the acquirer, the Card Brands, and law enforcement agencies. Factoring occurs when a merchant uses its merchant account to process transactions for another entity. One way factoring occurs is when a merchant creates a shell company to act as a front and applies for a merchant account through the shell company. Once the merchant account is approved, the fraudulent merchant then launders its own transactions through the shell company's merchant account. Factoring is illegal and constitutes fraudulent conduct under First Data's policies and the Card Brand Rules.

14. Factoring qualifies automatically as a violation of Visa Rules 1.10.1.3 and 10.2.2.12 and Mastercard Rule 1.13.2 as fraudulent conduct. It also qualifies as brand-damaging activity pursuant to Visa Rule 1.10.1.3 and Mastercard Rules 1.13.2, 3.7 and 5.11.7. In each instance, Mastercard will also deem factoring as a

---

[2] CBD is an oil derived from the plant *Cannabis sativa L.* To my knowledge, CBD was illegal under 21 U.S.C. §§ 802(16), 812 at all relevant times prior to December 2018 when the president signed the 2018 Farm Bill.

6
DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69553931.10

1 violation in Mastercard Rule 5.1 since the activity was not accurately reflected in the merchant agreement entered into.

15. The sale of illegal products separately violates Visa Rules 1.5.1.4 and 1.10.1.3 and Mastercard Rules 1.13.2, 3.7, and 5.11.7. In each instance, the Card Brands have the discretion to issue significant fines.

16. Selling products other than those disclosed on a merchant application and approved by First Data qualifies as fraudulent conduct under First Data's policies and the Card Brand Rules, including but not limited to Visa Rules 1.10.1.3 and 10.2.2.12 and Mastercard Rule 1.13.2.

17. Another way some merchants try to conceal their prohibited conduct is to improperly use an incorrect Merchant Category Code ("MCC") or Standard Industrial Classification ("SIC"). An MCC is a four-digit code created by the Card Brands. The Card Brands use MCCs to classify merchants by the types of good or services they sell. MCCs are sometimes (incorrectly) referred to as SICs. SICs are determined by the federal government, not the Card Brands, and the codes and descriptions do not match the Card Brands' MCCs. Merchants and ISOs that submit merchant applications are required to use MCCs that accurately reflect the products or services the merchants sell. Intentionally using an incorrect or inaccurate MCC constitutes fraudulent conduct under First Data's policies and the Card Brand Rules, including but not limited to Visa Rules 1.10.1.3 and 10.2.2.12 and Mastercard Rule 1.13.2.

18. In support of BRAM and GBPP and in order to best implement and comply with the Card Brand Rules, First Data contracts with a company called G2 to help identify merchants engaged in activity that is illegal, brand-damaging or prohibited by other Card Brand Rules. Generally, First Data provides G2 with a list of merchants along with the website URL the merchant provided on its merchant application. G2 then performs ongoing screening of each URL on a monthly basis

to identify content that would be illegal or brand-damaging. If a merchant did not provide a URL, G2 would attempt to locate the merchant's URL for screening. G2 also maintains a list of URLs known to sell illegal or brand-damaging products. G2 performs ongoing test transactions of merchant URLs and known websites that sell illegal or brand-damaging products. In running a test transaction, G2 attempts to purchase illegal or brand-damaging products from a website (with full knowledge that the issuer of the card would decline the transaction) and then can trace the transaction to a specific merchant's account by comparing the transaction information with First Data's files. G2 uses the test transactions to see what merchant accepted the subject transaction and then notifies First Data if one of First Data's merchants processed the test transaction. This notification is made via G2's web portal. The detection would appear on a screen and a staff member at First Data would be required to review the detection, understand what was detected, and then complete their own investigation to ensure First Data was comfortable with that detection and determine whether to terminate the merchant's account.

19. As of approximately November 14, 2017, G2 had identified 16 accounts Green Payment had submitted that were engaged in fraudulent, illegal, and/or brand-damaging activity. G2 eventually identified 11 more accounts, for a total of 27. A true and correct copy of the spreadsheets created by First Data that list the merchants G2 identified is attached hereto as **Exhibit O** and **Exhibit P**.

20. The G2 identifications began on or about January 2, 2017 and continued consistently from that date through November 14, 2017. Of the 16 accounts G2 had identified as of November 14, 2017, most of the accounts were identified due to the sale of kratom. Some were identified due to the sale of CBD

1 and one was identified due to the sale of San Pedro cactus seeds.[3] In each of the 16
2 cases G2 performed a test transaction at a website that was selling those products
3 by making purchases of those products and then tracing the transactions back to the
4 16 merchants. G2 traced the transactions by reviewing the authorization messages
5 for each transaction and comparing the name, account number, and acquirer in that
6 authorization message with the merchant information First Data provided to G2.

7     21. In each case, First Data confirmed G2's findings before terminating
8 the identified merchant accounts. Accordingly, in each instance, First Data
9 determined that Green Payment submitted merchant applications for merchants
10 that sold unqualified or prohibited products and were engaged in fraudulent and
11 illegal activity, including but not limited to factoring and selling products that were
12 not disclosed on their merchant applications and therefore violated First Data's
13 policies and the Card Brand Rules.

14     22. In addition to the G2 identifications, on or about October 30, 2017,
15 Visa separately notified First Data that it had identified another Green Payment
16 merchant engaged in activity that law enforcement identified as illegal and/or
17 brand damaging. *See* **Exhibit J**.

18     23. In my 19 years working at First Data, this is by far the most G2
19 detections I have witnessed in such a short period of time, especially relative to the
20 size of an ISO's portfolio. Green Payment had approximately 500 open merchant
21 accounts in November 2017. From January 2017 to November 2017 alone, as
22 discussed above, 16 accounts had been detected for unqualified, illegal, and/or
23 brand-damaging conduct. Green Payment boarded approximately 100 accounts
24 during that time. The number of identifications relative to the timeframe, the
25 number of accounts boarded during that timeframe, and the size of the portfolio

---

[3] San Pedro cactus seeds contain mescaline, which is a Schedule I controlled substance under 21 USC § 812(c)(11).

9

DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69553931.10

confirmed to First Data that there was a trend consistent with fraudulent activity and/or activity that would be injurious to First Data, Wells Fargo, and the Card Brands.

24. Beginning on or about January 2, 2017, in each instance where an account was identified by G2 and was ultimately terminated, First Data promptly notified Green Payment of the reason for the termination. The notifications were provided by phone call and/or electronic message. To my knowledge, Green Payment never notified First Data that it was conducting any investigation regarding the accounts.

25. Of the 16 G2 detections First Data was aware of as of November 14, 2017, First Data determined all involved the sale of products deemed by the Card Brands to be illegal or brand-damaging and at least 14 involved fraud. The information provided on the merchant applications was not consistent with what the merchant was actually selling. The merchant applications reflected the merchants were selling certain products to get the accounts approved and First Data found they were selling something else. For example, one merchant indicated it was selling clothing when in fact it was selling kratom. True and correct copies of the merchant applications are attached hereto as collective **Exhibit** Q.

26. Based on First Data's confirmation of the G2 detections, on or about November 14, 2017, I participated in a call with certain other First Data employees. During that call, we made the decision to terminate the Marketing Agreement with Green Payment.

27. On or about November 29, 2017, First Data sent a letter to Green Payment notifying Green Payment of the termination. I was not involved in drafting or sending that letter; however, the termination letter correctly states First Data was terminating the Agreement pursuant to Sections 18(b)(ii), (iii) and (ix). The letter mistakenly references 57 unqualified merchants instead of the 16 G2

10

identified accounts and the additional account Visa notified First Data of prior to November 14, 2017 that the termination was actually based upon. A true and correct copy of the termination letter is attached hereto as **Exhibit R**.

28. As First Data's Vice President, Credit Risk at all relevant times, I am familiar with First Data's policies and procedures concerning document creation and retention.

29. I have reviewed the documents listed in Table 1 that are attached to Defendants' Memorandum in Support of their Motion for Summary Judgment. All of these documents were:

- Made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters;
- Kept in the course of regularly conducted business activity by or on behalf of First Data; and
- Made as a regular practice by or on behalf of First Data.

These documents are or reflect the business records of First Data.

**Table 1**

| Exhibit | Description |
|---------|-------------|
| A | 1. Mastercard Rule 1.13.2 (2016) <br> 2. Mastercard Rule 3.7 (2016) <br> 3. Mastercard Rule 5.11.7 (2016) <br> 4. Mastercard Rule 1.13.2 (2017) <br> 5. Mastercard Rule 3.7 (2017) <br> 6. Mastercard Rule 5.11.7 (2017) <br> 7. Visa Rule Introduction (2016) <br> 8. Visa Rule 1.1.1.6 (2016) <br> 9. Visa Rule 1.5.1.4 (2016) <br> 10. Visa Rule 1.10.1.3 (2016) <br> 11. Visa Rule 10.2.2.12 (2016) |
| B | First Data Merchant Services Full Acquiring Clearing Solution – Retail Client Program, Program Standards as of October 2009 (FD0002447) |
| C | FDISS Direct Business Credit Policy Requirements Matrix-Wells (02/15/2011) (FD002475) |
| D | Program Standards (Retail) January 2013 (FD0002461) |
| E | FDISS Direct Business Credit Policy Requirements Matrix-Wells (02/15/2011) (FD002475) |
| F | Program Standards for "Retail" Customers Sponsored by Wells Fargo Bank September 2015 (FD0002491) |
| G | FDISS Retail ISO Credit Policy Requirements Matrix-Wells (3/4/2015) (FD002990) |
| H | Global Brand Protection Program Guide for Acquirers, Visa Supplemental Requirements, June 2017 |

| | | |
|---|---|---|
| 1, 2 | I | Letter from Visa to First Data dated March 28, 2016, attaching Illegal Transactions Violation Summary dated March 25, 2016 |
| 3, 4 | J | Letter from Visa to First Data re: Illegal Transactions Identification for Geniecard dated October 30, 2017 (FD0002551) |
| 5, 6 | K | Letter from Visa to First Data re: Illegal Transactions Identification for KC Natural Body Care dated February 12, 2018 (FD0002539) |
| 7, 8 | L | Letter from Visa to First Data re: Illegal Transactions Identification for Procura Oils dated February 18, 2018 (FD0002541) |
| 9, 10, 11 | M | Letter from Visa to First Data re: Synthetic/Designer Drugs Identification for Royal Fidget Spinner, LLC dated March 12, 2018 (FD0002543) |
| 12, 13, 14 | N | Letter from Visa to First Data re: Synthetic/Designer Drugs Identification for Bayshore Tech Solutions, LLC dated April 25, 2018 (FD0002537) |
| 15, 16 | O | Spreadsheet created by First Data Credit Policy group (FD0001616) |
| 17, 18 | P | Spreadsheet created by First Data Credit Policy group (FD0002887) |
| 19–27 | Q | Merchant Processing Applications and Agreements for:<br>1. Geniecard (FD0002599);<br>2. Ital Life, LLC (FD0001721);<br>3. JRH Clothing;<br>4. Botanical K LLC (GP003266);<br>5. BHB (GP004859);<br>6. Espy Distro LLC (GP000390);<br>7. Free River LLC (GP010023);<br>8. Goshen Life LLC (GP000452); |

13

DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-1463 DSF (ASX)

69553931.10

|   |   |   |
|---|---|---|
| | | 9. GRB Naturals LLC (GP006689); |
| | | 10. Infusionz LLC (GP003409); |
| | | 11. Basic Forest (GP000293); |
| | | 12. PFHO (GP009154); |
| | | 13. NJR Enterprises Intl LLC (GP000483); |
| | | 14. Raw Form Organics (GP000533); |
| | | 15. San Pedro Cactus LLC (GP015936); and |
| | | 16. E Botanic (GP000378). |
| | R | Letter from First Data to Green Payment re termination of Marketing Agreement dated November 29, 2017 (FD0002553) |
| | S | Marketing Agreement dated May 24, 2011 between First Data, Wells Fargo Bank, N.A., and Green Payment |
| | T | High Risk – Tier II Merchant Pricing Amendment to Marketing Agreement dated August 30, 2011 (FD002990) |
| | U | Email from L. Sablich to T. Dellomo, C. Robins, C. Wilson, B. Reilly, and J. Henaghan dated October 11, 2017 (FD000126) |

DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO.  2:18-CV-1463 DSF (ASX)

69553931.10

1  I declare under penalty of perjury under the laws of the United States of
2  America that the foregoing is true and correct.
3  Executed on July 19, 2019.

*[signature]*

Louis Sablich

DECLARATION OF LOUIS SABLICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT