1  Eugene Rome (SBN 232780)
   erome@romeandassociates.com
2  Sridavi Ganesan (SBN 216129)
   sganesan@romeandassociates.com
3  Brianna Dahlberg (SBN 280711)
   bdahlberg@romeandassociates.com
4  **ROME & ASSOCIATES, A.P.C.**
   2029 Century Park East, Suite 450
5  Los Angeles, CA  90067
   Telephone:   310-282-0690
6  Facsimile:   310-282-0691

7  Attorneys for Plaintiff
   GREEN PAYMENT SOLUTIONS, LLC,

8

9              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
10

11

12 | GREEN PAYMENT SOLUTIONS, LLC, | Case No. 2:18-cv-1463 DSF (ASx) |
|---|---|
13 | Plaintiff, | **PLAINTIFF GREEN PAYMENT SOLUTIONS, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
14 | v. | |
15 | FIRST DATA MERCHANT SERVICES CORPORATION; WELLS FARGO BANK, N.A.; and Does 1 to 100, | [Filed with: Plaintiff's Statement of Genuine Disputes; Declarations of Richard Cha and Brianna Dahlberg] |
16 | | |
17 | | |
18 | Defendants. | |
19 | FIRST DATA MERCHANT SERVICES LLC and WELLS FARGO BANK, N.A. | Date:   August 26, 2019<br>Time:   1:30 p.m.<br>Place:   Courtroom 7D<br>Judge:   Hon. Dale S. Fischer |
20 | | |
21 | Counter-Plaintiffs, | |
22 | v. | |
23 | GREEN PAYMENT SOLUTIONS, LLC, | |
24 | | |
25 | Counter-Defendant. | |
26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 1

II.    RELEVANT FACTS .................................................................................. 2

    A.     Background on the Parties ................................................................. 2

    B.     Relevant Terms of the Marketing Agreement ................................... 3

        1.     Defendants Were Solely Responsible for
            Underwriting and Approval of Merchants .............................. 3

        2.     Status of Kratom and CBD Under First Data's
            Credit Policy ........................................................................... 4

        3.     GPS's Use of Independent Contractor Sales Agents................ 5

    C.     Card Brand Rules and Status of Kratom and CBD............................ 7

        1.     GPS Fully Complied With the Available Card
            Brand Rules Applicable to ISOs............................................... 7

        2.     Status of Kratom and CBD Under Card Brand Rules ............... 7

    D.     GPS Attempted to Negotiate Better Pricing ..................................... 8

    E.     First Data Opened a Pretextual "Audit" Into GPS's
       Portfolio............................................................................................ 9

    F.     Defendants Terminated the Marketing Agreement ......................... 10

    G.     Defendants Took Over GPS's Portfolio, Including the
       "Bad" Merchants Identified in the Audit........................................ 11

    H.     After Termination, First Data Notified GPS that its
       Portfolio Has Passed the Annual Review ........................................ 12

    I.     After GPS Filed Suit, Defendants Invented New *Post Hoc*
       Rationalizations for Why They Terminated GPS ........................... 12

        1.     G2 Detections ....................................................................... 12

        2.     Visa Detections..................................................................... 13

        3.     Jesse Cretaro ......................................................................... 14

III.   ARGUMENT ......................................................................................... 16

    A.     GPS's Contract Claim Survives Summary Judgment ..................... 16

        1.     There Are Factual Disputes as to Whether
            Defendants Properly Terminated the Marketing
            Agreement.............................................................................. 16

i

2.    GPS Performed All Material Obligations Under the Marketing Agreement ................................................. 21

3.    The Evidence Demonstrates Defendants' Termination Was Based Upon a False Pretext ......................... 22

B.    Conversion ............................................................. 23

C.    Intentional Interference with Prospective Economic Relations ............................................................... 23

D.    Unfair Competition Law (Cal. Bus. & Prof. Code Section 17200) ................................................................. 24

E.    Accounting ............................................................. 25

IV.   CONCLUSION ................................................................ 25

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3
*Ace Securities Corp. Home Equity Loan Trust v. DB Structured*

4
    *Products*, Inc., 5 F.Supp.3d 543, 562, 562-63 (S.D.N.Y. 2014)..................22

5
*Anderson v. Liberty Lobby, Inc.*,

6
    477 U.S. 242, 255 (1986) ...............................................................19

7
*County of Suffolk v. Long Island Lighting Co.*,

8

9
    266 F. 3d 131, 139 (2d Cir. 2001)..................................................20

10
*Creative Waste Mgmt. v. Capitol Envtl. Servs.*,

11
    429 F.Supp.2d 582, 602 (S.D.N.Y. 2006).......................................18

12
*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,

13
    11 Cal. 4th 376, 411 (1995)............................................................25

14
*Jolley v. Chase Home Finance, LLC*,

15

16
    213 Cal. App. 4th 872, 910 (2013).................................................25

17
*Kirschner v. KPMG LLP*,

18
    15 N.Y.3d 446, 460 (N.Y. 2010).....................................................21

19
*Korea Supply Co. v. Lockheed Martin Corp.*,

20
    28 Cal. 4th 1134, 1143 (2003)........................................................25

21
*Kremen v. Cohen*,

22

23
    337 F.3d 1024, 1031 (9th Cir. 2003)..............................................23

24
*LaSalle Bank Nat'l Assn*,

25
    424 F.3d 195, 206 (2d Cir. 2005)...................................................20

26
*Matter of Spa & Organic Essentials of Pennsylvania, LLC*,

27
    2019 WL 1651607, *1 (M.D. Penn. April 17, 2019)......................17

28

*Sea Trade Co. Ltd. v. FleetBoston Financial Corp.*, 2007 WL 1288592,
    *4 (S.D.N.Y. May 1, 2007) (quoting *PaineWebber, Inc. v. Bybyk*,
    81 F.3d 1193, 1201 (2d Cir. 1996)) .............................................................. 18

*Sea Trade*,

    2007 WL 1288592 at *5 ................................................................................ 22

*See Sea Trade Co. Ltd.*,

    2007 WL 1288592 at *4 ................................................................................ 18

*Thyroff v Nationwide Mut. Ins. Co.*,

    8 N.Y. 3d 283, 292 (N.Y. 2007) .................................................................. 24

*United States v. Mallory*,

    372 F. Supp.3d 377, 378, 385 (S.D. Va. 2019) ...................................... 4, 17

*United States v. Reuer*,

    2019 WL 1012187, *1 (D. S. Dakota) ......................................................... 17

## **OTHER AUTHORITIES**

Cal. Bus. & Prof. Code § 16600 ............................................................................ 18

Cal. Bus. & Prof. Code § 17200 ............................................................................ 25

https://www.merriam-webster.com/dictionary/nutraceutical .................................... 2

https://www.webmd.com/mental-health/addiction/news/20100305/k2-
    spice-gold-herbal-incense-faq#1 ................................................................. 13

Restatement (Second) of Contracts § 237, cmt. c ................................................. 20

## **RULES**

Fed. R. Civ. Proc. 37(c)(1) ...................................................................................... 8

Plaintiff and Counter-Defendant Green Payment Solutions, LLC ("GPS") hereby submits its Opposition to the Motion for Partial Summary Judgment ("Motion") of Defendants First Data Merchant Services LLC ("First Data") and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, "Defendants").

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This case concerns a contractual dispute between parties in the credit card processing industry. For six years, GPS solicited merchants to sign up for credit card processing services with Defendants pursuant to Marketing Agreement. GPS built up a portfolio of over 600 merchants processing with Defendants and was earning residuals of over $100,000 per month on the merchants' processing. Halfway through the first renewal term of the agreement, GPS sought to negotiate better pricing from Defendants and threatened it would not renew the contract if the parties could not reach a deal. Critically, in the event of such a non-renewal, Defendants would be obligated to continue making residual payments to GPS on the existing merchants in the portfolio after termination. Rather than allow this to happen, shortly following the discussions regarding better pricing, Defendants terminated the Marketing Agreement for cause, asserting that GPS had improperly referred 57 "high risk" merchants operating in prohibited industries. Despite readily acknowledging in their Motion that even this number was substantially inflated, Defendants still contend the referral of these merchants to be a material breach of the Marketing Agreement. Defendants informed GPS that, as a result, it would no longer be paying residuals to GPS and would be retaining GPS's merchant portfolio for itself.

GPS filed suit against Defendants for breach of contract, conversion, intentional interference with prospective economic relations, and other claims, alleging that Defendants fabricated a pretext for terminating the Marketing Agreement "for cause." Defendants seek partial summary judgment of GPS's claims.

Defendants' Motion should be denied because there are disputed issues of fact as to whether: (1) whether the Marketing Agreement or rules of Visa and MasterCard ("Card Brand Rules") in effect at the time prohibited GPS from referring merchants

who sell kratom, an herbal supplement, or CBD, a non-intoxicating extract derived from the hemp plant; (2) whether GPS repeatedly breached any Card Brand Rule; and (3) whether GPS engaged in any fraud. Thus, there genuine factual disputes as to whether Defendants' termination of the Marketing Agreement was justified.

## II.   RELEVANT FACTS

### A.   Background on the Parties

GPS is an Independent Sales Organization, commonly referred to in the payments industry as an ISO ("ISO"), an entity which solicits merchants to sign up for credit card processing services with processors, such as First Data, in exchange for residual payments paid out of the revenue the processors receive from the merchants it refers. Pl.'s Statement of Genuine Disputes ("SGD") 157. In addition to Defendants, GPS has had relationships with other processors and sponsoring banks, including First Data's competitor TSYS. *Id*. at 158.

In 2011 GPS entered into to a Marketing Agreement with Defendants to solicit prospective merchants to open accounts with Defendants. *Id*. at 159. In August 2011, the parties entered into a High Risk – Tier II Amendment to the Marketing Agreement, which permitted GPS to refer merchants in certain "high risk" categories, such as those who sold herbal remedies and nutraceuticals.[1] *Id*. at 160. The High Risk – Tier II Amendment deleted and replaced the list of unacceptable businesses in Schedule B to the Marketing Agreement with an updated Credit Policy. *Id*. at 161. There were no further amendments to the Marketing Agreement after the 2011 High Risk – Tier II Amendment. *Id*. at 162

From 2011 to November 2017, GPS referred merchants to open payment processing accounts with Defendants pursuant to the Marketing Agreement. *Id*. at 163. As of November 2017, GPS had built up a portfolio of over 600 merchant accounts processing with Defendants. *Id*. at 164. Some of these merchants which GPS signed to Defendants were already doing business with GPS before, through other processors with whom GPS had relationships. *Id*. at 165. Many of the

---

[1]     Nutraceuticals include vitamins, dietary supplements, and other products derived from food sources that are purported to provide health benefits. *See* https://www.merriam-webster.com/dictionary/nutraceutical.

merchants in GPS's portfolio had longstanding business relationships with GPS and its employees and/or agents. *Id*. at 166.

The initial term of the Marketing Agreement was five years, with automatic renewal terms of two years. *Id*. at 167. If GPS opted not to renew the Marketing Agreement, Defendants' obligation to make residual payments on the existing merchants within GPS's portfolio would have continued after the date of non-renewal. *Id*. at 168. The same was true if Defendants opted to terminate the Marketing Agreement, unless the termination was "for cause" under certain provisions. *Id*. at 169.

The Marketing Agreement provides that GPS may sell its "right to receive future residual payments relating to Merchants developed by [GPS] pursuant to this Agreement ("[GPS's] Future Residuals") or obtain a loan secured by [GPS's] Future Residuals" subject to certain terms and conditions. *Id*. at 170. There exists a market for the purchase and sale of such ISO residual rights with respect to portfolios of merchants. *Id*. at 171. As of the time of Defendants' termination, GPS's right to future residuals on its portfolio was worth approximately $3.9 million. *Id*. at 172.

B. **Relevant Terms of the Marketing Agreement**

1. **Defendants Were Solely Responsible for Underwriting and Approval of Merchants**

Under the Marketing Agreement, once GPS submitted a merchant's application, Defendants were solely responsible for the deciding whether to accept the merchant. *Id*. at 173. Defendants were responsible for customer activation, credit approval, and the final risk classification of merchants. *Id*. at 174. In discovery, GPS learned that First Data was using an automated decisioning process under which applications for its merchants could be automatically approved without a person reviewing the materials submitted. *Id*. at 175.

GPS was required to "instruct existing and potential Merchants to furnish Defendants with such financial information as [Defendants] may time to time request." *Id*. at 176. However, Defendants expressly acknowledged that GPS ***is not***

***obligated to verify any financial information and makes no warranties regarding the accuracy of any financial information***." *Id*. at 177.

GPS further agreed to "obtain such information and take such action as [Defendants] may from time to time reasonably require . . ." including, if necessary, inspecting a merchant's premises and submitting an inspection report, but in six years Defendants never requested GPS to inspect a merchant's premises. *Id*. at 178. Before submitting applications to First Data, GPS took all necessary steps to verify that prospective merchants conducted or intended to conduct a bona fide business operation, including visiting the URLs provided by Internet merchants. *Id*. at 179.

### 2. Status of Kratom and CBD Under First Data's Credit Policy

Kratom is an herbal supplement that is sold at vitamin stores in liquid or dry form as an energy booster, mood enhancer, pain reliever, and antidote for opioid withdrawal. *Id*. at 180. CBD, or cannabidiol, is a non-intoxicating extract derived from hemp that is sold in the form of oils, capsules, and topical health and beauty products. *Id*. at 181. CBD products are sold at major retailers including Walgreens, CVS, Kroger, Ulta Beauty, the supplement retailer GNC, and the apparel retailer Urban Outfitters. *Id*. at 182.[2] CBD products are also sold at health food stores, pet stores, and coffee shops. *Id*. at 184. Defendants contend that GPS breached the Marketing Agreement by referring merchants who sold kratom and CBD, but neither the updated Credit Policy attached to the High Risk – Tier II Amendment or the original Schedule B mention kratom or CBD among the list of unacceptable products or businesses. *Id*. at 185.

Defendants contend that in 2015, First Data updated its Credit Policy to clarify that merchants who sell kratom are prohibited, but they fail to offer admissible evidence that the 2015 Credit Policy was actually sent to GPS or that GPS received it. *See* Pl.'s Response to Defs.' SUF 44. The High Risk – Tier II Amendment provides that "written notice" to GPS is required if Defendants wish to further modify the

---

[2] Defendants contend that Plaintiff incorrectly coded CBD merchants as "miscellaneous and specialty retail stores" or "miscellaneous food stores," but CBD is often sold in such stores. SGD 182. If a merchant sells CBD products among many other products—*e.g.*, at a health food or convenience store—that does render a code describing the general business false.

Credit Policy, but GPS received no notice from Defendants that they were further modifying the Credit Policy after the parties entered into the High Risk – Tier II Amendment. SGD 186. GPS had no knowledge that any updated Credit Policy existed, nor did it ever assent to any updated version. *Id.* at 187.

In 2017, the First Data Regional Business Director assigned to manage GPS was Joyce Adams. *Id.* at 188. As the Regional Business Director, Ms. Adams was GPS's main point-of-contact with First Data and was responsible for overseeing and managing GPS's relationship with First Data. *Id.* at 189. In her deposition, Ms. Adams testified that she herself had no knowledge of First Data's policies for merchants that sell kratom or CBD and she could not recall ever discussed those topics with GPS. *Id.* at 190. First Data's Rule 30(b)(6) witness on the topic of communications with GPS testified that he had not seen any email communication to GPS informing it that an updated Credit Policy referring to unacceptable merchants existed. *Id.* at 191.

The Regional Business Director assigned to GPS prior to Ms. Adams, Stacy Salame, similarly testified that she did not know whether kratom or CBD were prohibited by First Data. *Id.* at 192. During the relevant October 2017 time frame, Ms. Salame was Vice President of ISO Solutions at First Data. *Id.* at 193. Ms. Salame testified in her deposition that she does not know what kratom is, but she is aware that "there's a lot of people that sell [CBD]." *Id.* at 194.

Contrary to Defendants' claim that Mr. Cha admitted at his deposition that he knew during the relevant time period that the sale of kratom violates the Card Brand Rules, Mr. Cha actually testified that even in 2019, well after this lawsuit was filed and Defendants' actual claimed basis for the termination was disclosed, that he "is not 100 percent sure" whether kratom violates the Card Brand Rules. *Id.* at 195. Mr. Cha also testified that he is aware that CBD is not prohibited under the Visa and MasterCard rules. *Id.* at 196.

### 3.    GPS's Use of Independent Contractor Sales Agents

GPS used independent contractor sales agents to solicit merchants, and Defendants were aware of this fact. *Id.* at 197. These are individuals who typically

work remotely and simply send prospective merchant applications to ISOs such as GPS. *Id.* at 198. One of those agents was Jesse Cretaro, who contracted with GPS through his own company, Mensch LLC. *Id.* at 199. GPS recruited Mr. Cretaro from another First Data ISO, and he had prior training on First Data's policies. *Id.* at 200.

Contrary to Defendants' claims, Mr. Cretaro's Independent Contractor Agreement dated January 22, 2015 required him to comply with the Card Brand Rules and all other applicable laws and regulations. *Id.* at 201.The Independent Contractor Agreement further required Mr. Cretaro to "conduct business in a manner that reflects favorably at all times on [GPS's services]," to "avoid deceptive, misleading, or unethical practices . . ." and to "make no false or misleading representations with regard to [GPS or its services]." *Id.* at 202.

Like many of GPS's independent contractor sales agents, Mr. Cretaro did not work exclusively for GPS and also submitted merchant applications through other ISOs and processors with whom he had relationships. *Id.* at 203. Mr. Cretaro worked with at least 11 other ISOs and 55 sponsoring bank relationships, unrelated to GPS. *Id.* at 204. When Mr. Cretaro submitted merchants to these other ISOs and processors, these submissions were entirely for Mr. Cretaro's own benefit with no benefit to GPS. *Id.* at 205. Under his agreement and GPS's company policy, Mr. Cretaro was prohibited from using the Green Payment name or his Green Payment email address for business unrelated to GPS. *Id.* at 206.

During the parties' six-year relationship, First Data never contacted GPS regarding any concerns about Mr. Cretaro or any other independent contractor sales agent's conduct. *Id.* at 207. The Marketing Agreement provides that:

> [Defendants] may, in their sole discretion, refuse to accept Merchant Applications and Merchant Agreements from any [independent contractor] that [Defendants] reasonably believe is or has been engaging in fraudulent or illegal activity or activity that is materially injurious to Bank, cardholders, Visa, MasterCard, or [Defendants]; provided, however, that in the event [Defendants] reasonably believe that any [independent contractor] is or has been engaging in such activity, **in good faith, [Defendants] will consult with [GPS], and [Defendants] and [GPS] will work together to remedy any and all such issues.**

*Id.* at 208. Had Defendants raised any concern to GPS that they believed Mr. Cretaro was engaged in "factoring" or fraudulent or illegal activity, GPS would have worked with Defendants to immediately address the issue. *Id.* at 209. GPS maintained a very large portfolio of merchants with First Data, and therefore safeguarding its relationship with First Data and preserving its ownership of the extremely valuable merchant portfolio build up over years of work was of importance to GPS. *Id.* at 210.

**C.   Card Brand Rules and Status of Kratom and CBD**

**1.   GPS Fully Complied With the Available Card Brand Rules Applicable to ISOs**

Visa and MasterCard issue various Card Brand Rules applicable to their services. *Id.* at 211. There are different Card Brand Rules for acquirers, processors, ISOs, merchants, and cardholders. *Id.* at 212. Some Card Brand Rules are publicly available and others are confidential to the Card Brands. *Id.* at 213. In the Marketing Agreement, GPS agreed to comply with "(i) all Rules that are publicly available, made available to ISO by Service Providers, or available to ISO upon request from any Bank Card association, and (ii) applicable laws and regulations." *Id.* at 214.

At all times, GPS complied with the available Card Brand Rules applicable to ISOs with respect to the merchant applications it submitted to Defendants. *Id.* at 215. It was not, however, required to comply with the Rules applicable to acquirers or banks (except in the case of Discover, which is not relevant here). *Id.* at 216. Moreover, Card Brand documents setting forth rules and policies for acquirers are sometimes confidential and unavailable to GPS, as it is not an acquirer. *Id.* at 217. As plain logic mandates, GPS is unable to comply with terms and conditions of which it has no awareness nor can readily obtain. *Id.* at 219.

**2.   Status of Kratom and CBD Under Card Brand Rules**

It is undisputed that neither kratom nor CBD are referenced in any Card Brand Rules. *Id.* at 220. Defendants rely upon a document Visa issued in June 2017 called "Global Protection Program Guide for Acquirers" to argue that Visa had "clarified" that kratom sales were prohibited, but this is a confidential document that was not

available to GPS from Visa as it is not an acquirer.[3] *Id.* at 221. Defendants never previously provided this document to GPS.[4] *Id.* at 222.

Defendants further suggest that GPS should have known kratom was not allowed because First Data received five violation notices from Visa, but (1) the notices do not specify that kratom was the reason the merchant was in violation, (2) one notice relates to a merchant of a different ISO, and (3) three of the notices date from the time period after GPS's termination, after GPS was no longer involved with those merchants. *Id.* at 224. As for the sole notice received prior to termination, First Data first notified GPS of the violation at the time of the termination. *Id.* at 225.

Defendants also claim that kratom and CBD were encompassed under Card Brand Rules which bar illegal transactions, but sales of kratom and CBD are not illegal. *See* p. 17 *infra*. CBD derived from hemp is not illegal under federal law. *Id.* Numerous mainstream retailers carry CBD products. SGD 226. Kratom is not illegal under federal law, either. *See* p. 17 *infra*. During the relevant time period, kratom was available as an over-the-counter herbal supplement sold at vitamin stores. *Id.* at 227.

### D.   GPS Attempted to Negotiate Better Pricing

Beginning around early 2017, Green Payment sought to negotiate more favorable pricing from First Data. In April 2017, during an in-person meeting at GPS's Los Angeles office, Mr. Cha asked for better pricing. *Id.* at 228. Over the next few months, Ms. Adams and Mr. Cha continued these discussions. *Id.* at 229.

During this time period, the Marketing Agreement's original five-year term had expired and the agreement had auto-renewed for an additional two-year term set to end in November 2018. *Id.* at 230. Ms. Adams and Mr. Cha discussed the possibility of an early renewal if First Data would provide more favorable pricing. *Id.* at 231. Mr. Cha also told Ms. Adams that in the event we were not able to reach a new deal on pricing, Green Payment would likely not be renewing its contract. *Id.*

---

[3]   "Acquirers" are synonymous with banks, like Wells Fargo herein.  Documents and agreements between acquirers and Card Associations, such as Visa and MasterCard are confidential and, by their own provisions, are not shared with ISOs, such as Plaintiff.

[4]   Defendants did not produce this document in discovery. *Id.* at 223. It should therefore be excluded under Federal Rule of Civil Procedure 37(c)(1).

Ms. Adams consulted with her colleagues at First Data and on September 22, 2017, she received an updated pricing proposal for GPS's portfolio from a Manager in Partner Solutions Deal Pricing, who told her to "feel free to share the proposal sheet with the client," *i.e.*, GPS. *Id.* at 232. Instead of sharing the proposal with GPS, however, Ms. Adams discussed the proposal with her supervisor, Ms. Salame. *Id.* at 233. Following that conversation, there was a decision made ***not*** to share the pricing proposal with GPS. *Id.* at 234. Instead, on October 11, 2017, First Data opened an audit into GPS's portfolio. *Id.* at 235.

## E.   First Data Opened a Pretextual "Audit" Into GPS's Portfolio

The type of audit opened in October 11, 2017 was *not* a routine practice by First Data. First Data's Vice President of Credit Policy, Louis Sablich, testified that in his 19 years at First Data, there were only three previous instances in which he was involved in conducting a similar portfolio-wide audit of an ISO's portfolio. *Id.* at 236.

First Data's Rule 30(b)(6) witness on the audit, Catherine Marinzel, testified that her team reviewed GPS's portfolio for merchants that could potentially be deemed "high risk" or "unqualified" by First Data. *Id.* at 237. The team red-flagged 57 merchants within GPS's portfolio as "potentially a higher priority for review," and yellow-flagged an additional 130 merchants as "a lower priority." *Id.* at 238.

In identifying the "high risk" or "unqualified" merchants, First Data's auditors made numerous questionable judgment calls. The 57 red-flagged merchants included:

- The Fort Fischer Civil War Museum – flagged because its website discusses "topics of controversy;"
- A pet store, Puppy Heaven – flagged for selling live dogs;
- The Law Office of Bruce Margolin – flagged because Mr. Margolin is a "criminal defense attorney specializing in marijuana law;"
- Hidow West – selling a "pain, joint and discomfort device for muscles;"
- Novus Med Plan, a Nevada health insurance company – flagged for reference to cannabis on website;
- Crystal Art Gallery – flagged because "linked to several accounts that are now closed but were open for a short period of time;"

- GPS's own merchant account – "processing looks bad[.]"

*Id.* at 239.[5]

In her deposition, Ms. Marinzel testified she did not know that GPS was permitted to board high risk merchants under its policy with First Data. *Id.* at 240. In conducting the audit, First Data did not review GPS's contract, which included the High Risk – Tier II Amendment modifying the Credit Policy to permit GPS to refer merchants in certain categories that would otherwise be deemed unqualified. *Id.* at 241. Ms. Marinzel also testified that she did not specifically reference any Card Brand Rules. *Id.* at 242. On October 31, 2017, Ms. Marinzel provided the results of the audit to Mr. Sablich and others at First Data. *Id.* at 243.

Mr. Sablich testified that, prior to the decision to terminate GPS was made, a team in the Fraud group led by Jasmine Salvi then went through the findings of Ms. Marinzel's audit to see if they could confirm the findings. *Id.* at 244. Ms. Salvi's team also reviewed the merchants identified by G2 going back to January 2017, and the sole merchant identified by Visa at the time, GenieCard. Mr. Sablich testified that of the merchants identified in Ms. Marinzel's audit, or by G2 or Visa, there were none that First Data could ultimately determine to be operating in the medical marijuana industry, the drug paraphernalia industry, the money transfer service industry. *Id.* at 245. Mr. Sablich further testified that of the accounts identified by G2 or Visa, none could be confirmed to be selling kratom or CBD. *Id.* at 246. Moreover, Ms. Salvi concluded that ***no*** additional merchant accounts in either the red-flagged group of 57 or yellow-flagged group of 130 needed to be terminated, apart from those which had been terminated already.[6] *Id.* at 248

## F.   Defendants Terminated the Marketing Agreement

On November 8, 2017, Mr. Cha and Ms. Adams had a further call to re-visit pricing discussions. *Id.* at 250. On that call, Mr. Cha reasserted to Ms. Adams that if GPS did not receive better pricing, it would not be renewing its contract. *Id.* at 251.

---

[5]   In addition, when the audit reviewers were unsure whether products merchants were selling violated First Data's policy, they red-flagged the merchant. *Id.* at 247.

[6]   Mr. Sablich suggested that one additional merchant, GenieCard, was at the time in the process of being terminated. *Id.* at 249.

On November 14, 2017, Mr. Sablich and others at First Data decided to terminate GPS for cause, take GPS's portfolio of merchants, and withhold residuals from GPS. *Id.* at 252.  On or about November 29, 2017, First Data sent GPS notice that it was terminating the Marketing Agreement for cause. *Id.* at 253. In the notice, First Data asserted that during a recent audit, it had discovered that GPS recently boarded approximately 57 "high risk" merchants in violation of the Marketing Agreement and Card Brand rules, and an additional 130 merchants believed to be in the business of selling drug paraphernalia, but First Data did not identify the merchants. *Id.* at 254, 259.

The statements in the notice referencing the purported identification of 57 "high risk" merchants and 130 additional drug paraphernalia merchants were based upon Ms. Marinzel's audit. *Id.* at 255. First Data knew at the time that this purported basis for termination was not accurate, as Mr. Sablich testified that First Data's Fraud team had attempted to confirm the audit findings prior to November 14, 2017 and was unable to do so. *Id.* at 256. The signatory to the notice, Ms. Adams, testified that she had no involvement in preparing its content, that she could not recall who prepared it but she was instructed to sign it, and that she did not know why First Data was terminating GPS for cause. *Id.* at 257.

In the termination notice, First Data informed GPS that it would no longer be paid residuals and that Defendants would be now be rendering all services to the merchants in GPS's portfolio. *Id.* at 258.

**G.** **Defendants Took Over GPS's Portfolio, Including the "Bad" Merchants Identified in the Audit**

Following GPS's termination, First Data transferred the accounts of GPS' merchants over to First Data's in-house service group, EMPS. *Id.* at 260. As noted above, despite the purported findings that 57 and 130 merchants within the portfolio were "bad," First Data did not terminate ***any*** merchants before moving the portfolio and continued processing for merchants it had claimed to be "illegal and/or brand damaging" in the notice of termination. *Id.* at 261.

### H.   After Termination, First Data Notified GPS that its Portfolio Has Passed the Annual Review

After the termination, on February 12, 2018, First Data sent GPS a letter stating it had completed its annual contract review of GPS's portfolio for the processing year. *Id.* at 262. The letter stated the purpose of the annual review was "to review the billing for the previous processing year and advise Green Payment Solutions, LLC of any contractually obligated adjustments." *Id.* at 263. No contractually obligated adjustments were provided. *Id.* The letter also stated: "We appreciate Green Payment Solutions, LLC's continued partnership." *Id.* at 264. When questioned about the letter, Ms. Adams said she had "no explanation." *Id.* at 266.

### I.   After GPS Filed Suit, Defendants Invented New *Post Hoc* Rationalizations for Why They Terminated GPS

After GPS filed the Complaint, Defendants changed their stated basis for the termination. In their Motion, they now claim the termination was based upon detections by G2 and Visa that GPS's merchants had sold kratom and/or CBD; that GPS's outside referring agent, Jesse Cretaro, knowingly boarded merchants who sold illegal and/or brand-damaging products or were engaged in fraudulent activity; that Mr. Cretaro instructed merchants to provide false or misleading information on their applications and "manipulated" applications "to disguise the business entity;" and, finally, that GPS received "repeated notifications" from First Data but did not nothing to remedy the issue. However, the evidence shows that these accusations are false, or that at a minimum, disputed issues of fact exist.

#### 1.   G2 Detections

Defendants now contend the termination of GPS was triggered by notices First Data received from G2 regarding 16 merchants selling kratom and CBD. However, the G2 detections at issue date back to January 2017, ten months prior. Defs.' SUF 74. Defendants have not produced the actual G2 notices or any related documentation received from G2 in discovery. SGD at 267. Instead, Defendants have relied on charts First Data prepared for purporting to summarize G2's findings. *Id.* at 268.

Such "summaries" of the G2 notices' content are inadmissible hearsay and violate the best evidence rule. F.R.E. 801, 803, 1002.

Moreover, contrary to Defendants' claim, GPS was never notified of any G2 detections of its merchants prior to its termination. *Id.* at 269. When First Data's Rule 30(b)(6) representative on the topic of its communications with Green Payment was asked whether, prior to the November 2017 termination letter, First Data had ever communicated to GPS that it had received any G2 alerts regarding merchants in GPS's portfolio, he answered "no." *Id.* at 270.

### 2.   Visa Detections

Defendants also now contend that the termination was due to a Visa detection and/or fines regarding a merchant, GenieCard, who was purportedly "engaged in activity law enforcement found was illegal and/or brand damaging." However, the First Data Rule 30(b)(6) representative on its communications with GPS testified that he had seen no communication informing GPS that First Data had received any Card Brand notices or fines prior to November 2017. *Id.* at 271. First Data's further testified that it was "not uncommon" for First Data to receive such notices in connection with merchants in ISOs' portfolios, generally speaking. *Id.* at 272.

Visa sent the notice regarding GenieCard to First Data on October 30, 2017— after First Data had already begun its audit of GPS's portfolio. *Id.* at 273. First Data manually approved GenieCard's merchant's application because it was a publicly traded company. *Id.* at 274. Defendants have not alleged that any information on GenieCard's merchant application provided by GPS was false or fraudulent. *Id.* at 275. In Visa's detection letter, Visa alleged that GenieCard was selling "herbal incense" through websites online.[7] *Id.* at 277.

Notably, after First Data terminated GPS, Visa ***waived*** its assessment that GenieCard had violated its rules. After First Data notified GenieCard of the purported violation, GenieCard sent a letter to First Data explaining that it had no affiliation with the websites at issue and that Visa's findings were in error. *Id.* at 277. On

---

[7] Herbal incense is a synthetic designer drug. https://www.webmd.com/mental-health/addiction/news/20100305/k2-spice-gold-herbal-incense-faq#1.

January 9, 2018, Visa notified First Data that "the facts support a waiver of the non-compliance assessment." *Id.* at 278. However, Defendants did not reinstate GPS.

### 3.   Jesse Cretaro

There are disputed issues of fact as to whether Mr. Cretaro engaged in improper conduct that would justifying Defendants' termination "for cause" and withholding of GPS's future residuals. Two merchants who submitted applications through Mr. Cretaro were deposed, Tim Haywood and Nate Weinberg. When they were questioned about the purportedly fraudulent applications submitted by Mr. Cretaro, Defendants' allegations did not withstand scrutiny.

<u>Tim Haywood</u>

Defendants contend that Mr. Cretaro instructed CBD and kratom merchants on "how to avoid detection" by Defendants and advised them to submit altered bank documents and false information. Defendants rely upon the declaration and deposition testimony of Tim Haywood, a merchant who sold kratom online. *See* Defs.' SUF 93, 97, 99, 100, 103, 122, 136, 143. Mr. Haywood's declaration states that Mr. Cretaro assisted him in submitting an application to First Data in July 2016, knowing that his business that sold kratom. *Id.* at 279. About one year later, Mr. Cretaro assisted Mr. Haywood with setting up various "back up" accounts with other processors, and submitted fraudulent information and documents in support of those applications. *Id.* at 280. Mr. Cretaro did not submit the "back up" applications through GPS, but through other ISOs/processors with whom he works. *Id.* at 281.

In his deposition, Mr. Haywood testified that the only information on his First Data merchant application that was not true and correct was that the name of his business was an abbreviation. *Id.* at 282. He testified that the description of his merchandise on the application ("bulk botanicals") was accurate. *Id.* at 283.   Mr. Haywood confirmed he signed all the merchant applications and had certified that the information provided was true and correct. *Id.* at 284.[8]

---

[8]  Mr. Haywood further testified that his declaration had been written for him by Defendants' counsel. SGD 286. Mr. Haywood is a high-school dropout unrepresented by counsel and testified that he never considered hiring his own lawyer in connection with this case, even though he signed a declaration presented to him stating he had committed financial fraud. *Id.* at
(…continued)

In addition, while Mr. Haywood claimed that Mr. Cretaro had instructed him to submit a new application in his wife's name for a clothing business, which he actually intended to use for processing kratom sales, an email communication between Mr. Haywood and Mr. Cretaro confirms that it was *Mr. Haywood* who suggested to *Mr. Cretaro* submitting an application for a new account for JRH Clothing in Mr. Haywood's wife's name. *Id.* at 290. In the email, there is no mention of Mr. Haywood intending to use the account as a "front" for his kratom business. *Id.* at 291. In sum, there are disputed issues of fact as to the veracity of Mr. Haywood's declaration and as to whether Mr. Creatro, rather than Mr. Haywood himself, was responsible for any fraudulent applications.

Nate Weinberg / Infusionz

Defendants also assert that Mr. Cretaro told Mr. Weinberg, principal of Infusionz, a Colorado company that sold hemp and CBD products, to "use a different LLC that was not linked to CBD and to lie about what the LLC was selling" after a different processor (not Defendants) had closed one of the company's accounts. Mr. Cretaro assisted Mr. Weinberg in submitting a new application for an entity called Fusionz Confectionary LLC, but that entity was in fact a confectionary. *Id.* at 292. Mr. Weinberg testified that he never told anyone at GPS that the merchandise description, "Gourmet Candy," was not accurate, and that moreover, in his view it was not an inaccurate or false description of the products sold. *Id.* at 293. Mr. Weinberg further testified that all information on the applications was true and correct and there were no illegal transactions. *Id.* at 294. In short, there are genuine disputes of fact as to whether Mr. Weiberg's company submitted any fraudulent applications, let alone whether Mr. Cretaro committed fraud.[9]

---

(…continued)
286-287. When asked if he had an understanding as to what this lawsuit is about, he responded, "Not exactly, no." *Id.* at 288. He further testified that he had cooperated with Defendants' counsel because he understood that if he did not provide the information, Defendants' counsel may subpoena him and require him to travel, which he could not afford to do. *Id.* at 289.

[9] Defendants also assert that Mr. Weinberg referred other merchants who sold CBD to GPS, but the evidence demonstrates that Mr. Weinberg referred them to not to GPS but to Mr. Cretaro's own company. *Id.* at 295.

<u>Defendants did not Work With GPS In Good Faith to Remedy the Issue</u>

Contrary to Defendants' claims, GPS's principal, Mr. Cha, was not aware that Mr. Cretaro was engaged in any improper conduct. *Id.* at 296. When GPS received Mr. Haywood's declaration, in or around September 2018, GPS immediately terminated its relationship with Mr. Cretaro. *Id.* at 297. Mr. Cha testified that prior to that time, he did not know Mr. Cretaro had any involvement with kratom or CBD. *Id.* at 298. Mr. Cha also specifically denies that Mr. Conrad, an administrative employee at GPS, ever discussed any concerns with him about Mr. Cretaro "manipulating" applications. *Id.* at 300. Also contrary to Defendants' claims, GPS received *no* G2 notifications from First Data. *Id.* at 301.

If GPS had been notified about any issues regarding Defendants' belief that Mr. Cretaro was submitting fraudulent or improper applications, it would have worked with First Data to address the problem. In fact, the Marketing Agreement contains a provision specifically applicable to a situation where, as here, Defendants believe that an *independent contractor* is engaging in fraudulent or illegal activity (as opposed to the ISO itself engaging in the activity). *Id.* at 302. That provision required Defendants to, in good faith, consult with GPS and "work together to remedy any and all such issues." *Id*. at 303. This provision is customary in ISO contracts. *Id.* at 304. The purpose is to enable the ISO to remedy the violation, such as by terminating the agent, rather than the processor terminating the ISO altogether. *Id.* at 305.

Defendants failed to consult with GPS to remedy the issue here, with respect to suspected fraud by Mr. Cretaro, and instead proceeded directly to terminate GPS for cause and keep its entire portfolio—including merchants who had nothing to do with Mr. Cretaro or any alleged fraud.

**III.   ARGUMENT**

    **A.   GPS's Contract Claim Survives Summary Judgment**

        **1.   There Are Factual Disputes as to Whether Defendants Properly Terminated the Marketing Agreement**

Defendants contend that they properly terminated GPS and withheld its residuals because (1) GPS repeatedly breached the Card Brand Rules; and (2) GPS engaged in fraud. There are disputed facts as to both alleged grounds.

### a.   The Card Brand Rules Do Not Prohibit Kratom or CBD

First, Defendants claim that Mr. Cha admitted at his deposition that he was aware during the relevant time period that the sale of kratom violated Card Brand Rules, but the transcript does not support their assertion. Rather, Mr. Cha testified that even in 2019, after this lawsuit was well underway, he "was not 100%" sure kratom was prohibited by the Card Brands. SGD 195. Mr. Cha further testified that he is aware that CBD is not prohibited under the Card Brand Rules. *Id*. at 196. Neither kratom nor CBD are referenced in any Card Brand Rule. *Id*. at 220.

Next, Defendants argue that kratom and CBD merchants were encompassed under Card Brand Rules generally prohibiting "illegal and/or brand-damaging transactions." These products, however, are legal under federal law. *United States v. Mallory*, 372 F.Supp.3d 377, 385 (S.D. W. V. 2019) (sale of CBD was legal under 2014 Farm Bill, which carved out exception to Controlled Substances Act's cannabis prohibition for industrial hemp); *Matter of Spa & Organic Essentials of Pennsylvania, LLC*, 2019 WL 1651607, *1 (M.D. Penn. April 17, 2019) (FDA considers kratom to be a "food" under federal law); *United States v. Reuer*, 2019 WL 1012187, *1 (D. S. Dakota) (describing kratom as "a legal substance").[10]

### b.   The 2017 Visa Guide Updating the Kratom Policy Was Not Incorporated by Reference into the Agreement

Defendants have offered a confidential Visa document entitled "Global Brand Protection Guide for Acquirers" dated June 2017 ("2017 Visa Guide") as evidence that Visa deems kratom to be "brand-damaging," but there are triable issues of fact as to whether GPS had actually received or was aware of the 2017 Visa Guide. While the Marketing Agreement provides that GPS will comply with the bylaws, rules, and

---

[10] Defendants cite to law in Alabama, Arkansas, Wisconsin, and the District of Columbia prohibiting kratom, but there is no evidence in the record that GPS referred merchants selling kratom in those jurisdictions. The Visa letters cited by Defendants provide that "to comply with [Visa's] requirement," the "merchants' transaction activity must be legal in both the buyer's and seller's jurisdiction"—a requirement that GPS's merchants at issue here complied with. SGD 306.

regulations of the Card Brands, no edition of the Visa Guide is mentioned. Under New York law, which applies here,[11] "an extrinsic document is deemed to be incorporated by reference only when the agreement specifically references and sufficiently describes the document to be incorporated, such that the latter may be identified "***beyond all reasonable doubt***." *Sea Trade Co. Ltd. v. FleetBoston Financial Corp.*, 2007 WL 1288592, *4 (S.D.N.Y. May 1, 2007) (quoting *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)) (emphasis added). Further, "it must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid." *Creative Waste Mgmt. v. Capitol Envtl. Servs.*, 429 F.Supp.2d 582, 602 (S.D.N.Y. 2006).

The Marketing Agreement's reference to all bylaws, rules, and regulations is insufficient to establish that the 2017 Visa Guide setting forth Visa's new policy on kratom was incorporated by reference. *See Sea Trade Co. Ltd.*, 2007 WL 1288592 at *4 (reference to general "regulations" and "rules" of the Bank was not sufficient to incorporate by reference specific Terms and Conditions document). In addition, in *Sea Trade Co.*, like here, there are material disputes of fact as to whether GPS knew of or assented to the kratom policy in the 2017 Visa Guide. *Id.* at *5-6 (denying summary judgment where GPS offered affidavits showing he did not know of or asset to extrinsic terms and conditions). The 2017 Visa Guide is a *confidential* document available to *acquirers* (*i.e.*, banks). SGD 221. In Mr. Cha's declaration, he testifies that he did not know of or assent to the 2017 Visa Guide's terms. *Id.* at 222. The Court must credit Mr. Cha's declaration. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).[12]

---

[11]     New York law governs the Marketing Agreement generally, but California law applies to the non-solicitation provision because that provision is "contrary to the fundamental policy of California" in Business & Professions Code Section 16600. *See generally* Order Granting Pl.'s Motion for Partial Summary Judgment (Dkt. # 155). Plaintiff's claims other than breach of contract are brought under California law.

[12]     Moreover, even if the 2017 Visa Guide's kratom policy was incorporated by reference, Plaintiff's referral of the merchants alleged to be selling kratom pre-dates this policy. Defendants cannot plausibly claim that Plaintiff violated Card Brand Rules that did not exist at the time Plaintiff referred the merchants.

Additionally, Defendants have offered no evidence that GPS's *referral* of such merchants to First Data, as distinguished from the merchants' actual transactions, violated any Card Brand Rule. Once GPS referred a merchant to Defendants, Defendants, not GPS, were responsible for underwriting and deciding whether to accept the merchant. SGD 174. Similarly, even if Defendants could establish that any merchants referred by GPS violated the Card Brand Rules by using their accounts for factoring or other improper purposes—and they have not—there are no grounds for imputing those Card Rule violations to GPS merely because GPS unknowingly referred the merchant's application.

In sum, there are at minimum disputed issues of fact as to whether merchants' kratom and CBD transactions violated the Card Brand Rules to which GPS was bound in the Marketing Agreement. It is therefore disputed whether Defendants properly terminated GPS for repeatedly breaching the Card Brand Rules.

### c.   There Are Factual Disputes as to Whether GPS Engaged in Any Fraud Justifying Termination

It is also disputed whether Defendants properly terminated the Marketing Agreement for fraudulent activity by GPS under Section 18(b)(iii).

*First*, the Marketing Agreement contains a specific provision applicable to the circumstance where, as here, Defendants suspect that an independent contractor (here, Mr. Cretaro) has engaged in fraudulent activity. That provision, in Section 2(i), requires that Defendants may refuse to accept merchant applications from any independent contract they reasonably believe to be engaging in fraud, but that they first must "in good faith . . . consult with [GPS] together to remedy any and all such issues." *Id*. It is undisputed that Defendants failed to consult with GPS regarding any issues about Mr. Cretaro prior to termination.

Defendants may argue Section 2(i) does not apply because they had no reason to believe Mr. Cretaro was engaging in fraud, but his name is at the top of most of the "bad" merchants' applications. And, this only underscores that Mr. Cretaro's alleged misconduct is ***not*** the reason Defendants actually terminated the Marketing Agreement, but is in fact a *post hoc* rationalization to try to justify withholding GPS's

residuals and valuable merchant portfolio. Where, as here, an obligor has "knowledge of or reason to know" of a purported material breach, but it has "accepted the other party's performance or has given no reasons of the wrong reasons for its rejection," the obligor may be precluded from relying on the other party's failure of performance as an excuse for its own non-performance. Restatement (Second) of Contracts § 237, cmt. c (analogizing to a buyer who accepts defective goods, and then insists upon strict performance as a condition of duty to pay).

Defendants ignore this provision and contend that they can impute Mr. Cretaro's conduct to GPS for purposes of terminating the Marketing Agreement altogether under Section 18(b)(iii), which provides that Defendants may "immediately" terminate if there is "Fraudulent activity *by ISO*." However, it is "axiomatic that courts construing contracts must give specific terms and exact terms greater weight than general language." *County of Suffolk v. Long Island Lighting Co.*, 266 F. 3d 131, 139 (2d Cir. 2001). The language in Section 2(i) clearly and specifically addresses the parties' obligations when Defendants' believe a contractor has engaged in fraud and provides GPS an opportunity to cure the problem (for example, by terminating the sales agent) before Defendants can refuse to accept that contractor's applications. Read in light of Section 2(i), the language in Section 18(b)(iii) regarding "fraudulent activity by an ISO" means fraud *by the ISO itself*. To read Section 18(b)(iii) as encompassing fraudulent activity by an ISO's independent contractor imputed to the ISO would render the requirements of Section 2(i) superfluous and create an internal inconsistency. *LaSalle Bank Nat'l Assn*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.").

*Second*, to the extent Defendants argue that GPS itself and/or Mr. Cha condoned improper conduct by Mr. Cretaro, there are disputed issues of fact. Defendants' contention that GPS's employees "complained about GPS's submitting false and misleading information" is not supported by the evidence in the record. Mr. Conrad's testimony about Mr. Cretaro "manipulating" applications "to disguise the

business entity" is extremely vague as to the actual conduct. It is unclear, for example, if the examples involved merchants who legally structured their businesses under multiple separate entities. Mr. Conrad testified he did not know why it was done. *See* Pl.'s Response to SUF 102. Moreover, he confirmed in his deposition that, as an administrative employee who merely performed data entry, he had no personal knowledge as to the accuracy of any merchant information he transcribed. SGD 307. Mr. Cha unequivocally denies that Mr. Conrad or anyone else raised any concern regarding "manipulated" applications, or that he had any knowledge that Mr. Cretaro was engaged in the conduct described in the Haywood declaration at the time. Id. at 300. As soon as the conduct was brought to Mr. Cha's attention, GPS terminated its relationship with Mr. Cretaro and his company. *Id.* at 308.

Moreover, there are factual disputes as to whether Mr. Cretaro engaged in any fraud that can be imputed to GPS. Mr. Haywood's fraudulent applications attaching false documents were not submitted to First Data or through GPS, but were "back up" accounts Mr. Cretaro submitted to other processors with whom GPS has no business relationship. GPS received no conceivable benefit from these applications, unrelated to GPS's business and which Mr. Cretaro submitted exclusively for his own benefit. To the extent Mr. Cretaro engaged in any fraud with respect to the applications, it cannot be imputed to GPS because, as to them, Mr. Cretaro had "totally abandoned" GPS's interests and was "acting entirely for his own . . . purpose." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 460 (N.Y. 2010).

## 2.     GPS Performed All Material Obligations Under the Marketing Agreement

Defendants also argue that GPS cannot prove it performed under the Marketing Agreement, but GPS performed its material obligations. *See Ace Securities Corp. Home Equity Loan Trust v. DB Structured Products*, Inc., 5 F.Supp.3d 543, 562 (S.D.N.Y. 2014) (GPS's nonperformance would have to be "material" to bar its claims). GPS referred to Defendants over 600 merchant accounts over six years, generating substantial revenue for Defendants. Because GPS performed all obligations that "go to the root" of the agreement between the parties, and Defendants

received the benefits they reasonably expected, the element of GPS' performed is met. *See Ace Securities Corp.*, 5 F.Supp.3d at 562-63.

Further, Defendants' allegations that GPS violated First Data's Program Standards or Credit Policy (as opposed to the Card Brand Rules) by referring merchants who sold kratom and CBD fail because there is no evidence that GPS knew of or assented to any First Data Program Standard document or updated Credit Policy that stated these products were not allowed. GPS had no knowledge that the updated 2015 Credit Policy referencing kratom existed, nor did it receive notice of any other document from First Data stating that these products were unqualified. As with the 2017 Visa Guide, Mr. Cha's declaration (along with the testimony of First Data's own witnesses) raises a genuine issue of disputed fact as to whether GPS knew of and assented to the terms. *See Sea Trade*, 2007 WL 1288592 at *5. Evidence that the updated terms and conditions "were sent as a routine procedure" is not sufficient. *Id.* Because Defendants "[have] not submitted any affidavit, deposition testimony, or other evidence to assert that [the updated terms] were actually sent to [GPS] or that [GPS] received the document," summary judgment must be denied. *Id.* Even if GPS had received notice of an updated policy, it is further disputed that referring merchants who sold such products, which are "high risk" but not in violation of the Card Brand Rules, was a material breach.

Moreover, many of the other obligations which Defendants claim GPS failed to perform are not material terms—*e.g.*, purportedly failing to have a written contract with Mr. Cretaro requiring him to comply with the Card Brand Rules, or failing to document training procedures or conduct site visits—or were terms with which GPS actually *did* fact comply. For example, GPS did have a written contract with Mr. Cretaro's company that required him to comply with the Card Brand Rules and the relevant terms of the Marketing Agreement. SGD 201. There are also factual disputes as to whether GPS waived these obligations by failing to enforce them in six years.

### 3. The Evidence Demonstrates Defendants' Termination Was Based Upon a False Pretext

22

Further, as discussed above, there is ample evidence that Defendants' termination of the Marketing Agreement was based on a fraudulent pretext in anticipation of Mr. Cha's intended non-renewal. Mr. Sablich admitted that prior to deciding to terminate GPS, First Data's fraud team attempted to confirm the findings of G2, Visa, and the initial audit by Ms. Marinzel's team, but was unable to confirm the merchants were actually selling any prohibited products. Mr. Farkas confirmed that Defendants never sent GPS any G2 or Visa notices, and further, that it was "not uncommon" for First Data to receive such notices generally speaking. And, after Defendants terminated GPS, they continued processing for all the purportedly "bad" accounts referenced in the Notice of Termination. The timing of First Data's actions demonstrates their connection to GPS's warning that it would not renew unless it received better pricing. Thus, GPS's contract claim withstands summary judgment.

## B.   Conversion

Defendants contend that GPS's conversion claim fails for two reasons: first, that it "is predicated on a mere breach of contract," and second, that GPS cannot prove legal ownership of the residuals because Defendants properly terminated the Marketing Agreement. Both arguments fail.

First, GPS's conversion claim does not merely restate its contract claim, but alleges that Defendants engaged in tortious contract separate and apart from their breach of contract in withholding GPS's right to future residuals on its portfolio, which constitute a transferable, intangible asset to which GPS was entitled under the Marketing Agreement. Misappropriation of an intangible asset supports a claim of conversion. *Kremen v. Cohen*, 337 F.3d 1024, 1031 (9th Cir. 2003); *Thyroff v Nationwide Mut. Ins. Co*., 8 N.Y. 3d 283, 292 (N.Y. 2007). The separate tortious conduct is Defendants' fraudulent basis for terminating the Marketing Agreement. Second, as set forth above, there are numerous disputes of fact as to whether Defendants' termination of the Marketing Agreement was proper.

## C.   Intentional Interference with Prospective Economic Relations

GPS alleges that Defendants wrongful conduct interfered with its relationships with merchants, by preventing GPS from re-signing the merchants to other

processors. Defendants argue GPS's claim for intentional interference with prospective economic relations fails for three reasons, all of which fail.

*First*, Defendants contend that because GPS did not have direct contractual relationships with merchants, it had no economic relationships that were interfered with. However, a contract with the third party is not a prerequisite for an intentional interference claim. *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 112 (1990) ("[I]nterference with prospective advantage does not require proof of a legally binding contract."). GPS had longstanding relationships with many of the merchants in its First Data portfolio, including merchants with whom GPS was doing business with through other processors before the parties entered into the Marketing Agreement, as identified in Mr. Cha's declaration. GPS reasonably expected these relationships would continue to result in an economic benefit to it, but Defendants disrupted the relationships.

*Second*, Defendants argue GPS was not harmed because it was able to successfully re-sign some of the merchants, but GPS' efforts to mitigate its damages do not mean that it suffered no harm. The declaration of Mr. Cha establishes that GPS's business was harmed by Defendants' conduct. Defendants also argue that GPS was not harmed because the non-solicitation provision in the Marketing Agreement barred it from re-signing merchants with other processors, but the non-solicitation provision is void under California's Bus. & Prof. Code Section 16600. Dkt. # 155.

*Third*, Defendants argue GPS cannot prove that their conduct "was solely by malice" but this argument misinterprets the applicable law. Defendants' fraudulent termination constitutes "independently tortious conduct" that supports an interference claim. *See Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 411 (1995). In addition, the timing of the parties' pricing negotiations supports GPS's allegation of fraud. While there was a discussion in early November 2017, it was a continuation of negotiations that had begun at least in April 2016. Thus, GPS's intentional interference claim survives summary judgment.

## D.   Unfair Competition Law (Cal. Bus. & Prof. Code Section 17200)

Contrary to Defendants' argument, GPS's claim for violation of Section 17200

is not improper. "Section 17200 'borrows' violations from other laws by making them independently actional as unfair competitive practices." *Korea Supply Co. v. Lockheed Martin Corp.*, 28 Cal. 4th 1134, 1143 (2003). Thus, a Section 17200 claim can co-exist with other claims. Further, Defendants' argument that GPS's residuals are not available as damages ignores that GPS had a vested ownership interest in its right to future residuals on its portfolio, which was a transferable, intangible asset to which GPS was entitled under the contract. Thus, GPS's Section 17200 claim survives summary judgment.

### E.   Accounting

Contrary to Defendants argument, an accounting claim may be brought "where, even though no fiduciary relationship exists, the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable." *Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872, 910 (2013). Here, the determination of residuals owed to GPS, which are calculated based upon the processing activity of hundreds of merchants, though complex formulas, is the type of unusually complicated situation for which an accounting claim is appropriate. Defendants also argue that the claim fails because there must be "no adequate remedy at law," but that does not bar GPS from stating this claim in the alternative. Finally, contrary to Defendants' assertion, a demand is not one of the required elements of an accounting claim under California law. *Id.* at 910. Thus, GPS's accounting claim survives summary judgment. [13]

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion.

DATED: August 5, 2019          **ROME & ASSOCIATES, A.P.C.**

By:  _____*/s/ Brianna Dahlberg*_____
Brianna Dahlberg
Attorneys for Plaintiff / Counter-Defendant
**GREEN PAYMENT SOLUTIONS, LLC**

---

[13] Plaintiff concedes that the declaratory relief claim is superfluous.